SOCIETY FOR the PROTECTION OF
NEW HAMPSHIRE FORESTS et al.

v.

Claude S. BRINEGAR, Secretary of
Transportation, et al.

APPALACHIAN MOUNTAIN CLUB
et al.

v.

Claude S. BRINEGAR, Secretary of
Transportation, et al.

Civ. A. Nos. 74–208 and 74–219.

United States District Court,
D. New Hampshire.

Aug. 19, 1974.

Frederic K. Upton, Upton, Sanders & Smith, Concord, N. H., Samuel Hoar, Goodwin, Procter & Hoar, Boston, Mass., for plaintiffs.

John C. Boeckeler, Asst. Atty. Gen., State of New Hampshire, Robert Schwartz, Asst. U. S. Atty., for the District of New Hampshire, for defendants.

## OPINION AND ORDER ON MOTION FOR PRELIMINARY INJUNCTION

BOWNES, District Judge.

The Appalachian Mountain Club (A. M.C.) and the Society for the Protection of New Hampshire Forests (Society) have brought separate actions against Federal and State Highway officials asking that construction of the Littleton-Waterford segment and the Waterford-St. Johnsbury segment of Interstate Highway 93 be enjoined pending the completion of an Environmental Impact Statement (E.I.S.) that takes into consideration the impact of the entire proposed route of I–93 on Franconia Notch State Park.[1] Since both plaintiffs take essentially the same position, I treat them as one for purposes of this opinion.

■ The immediate issue before me is plaintiffs' motion for a preliminary injunction. The traditional test for the granting of preliminary relief depends on a showing by the plaintiffs that irreparable harm will result if the relief is not granted and that there is a probability of success on the merits. In a case involving the long-term effects of automotive traffic with its attendant noise, vibration, and air pollution on a small unique area of incomparable natural beauty, the word "irreparable" must be given a broad and expansive meaning. I–29 why? Association v. Burns, 372 F.Supp. 223, 262–263 (D.Conn.1974). In Environmental Defense Fund, Inc. v. Froehlke, 477 F.2d 1033 (8th Cir. 1973), the court recognized that the traditional definition of irreparable harm might not fit an environmental situation:

We recognize that the injunction is the vehicle through which the congressional policy behind NEPA can be effectuated, and that a violation of NEPA in itself may constitute a sufficient demonstration of irreparable harm to entitle a plaintiff to blanket injunctive relief. Id. at 1037.

■ Another factor to be considered on the issue of preliminary relief is a balancing of the harm to the plaintiffs as against the harm to the defendants if the project is halted. Silva v. Romney, 473 F.2d 287 (1st Cir. 1973); Allison v. Froehlke, 470 F.2d 1123 (5th Cir. 1972); County of Santa Barbara v. Hickel, 426 F.2d 164 (9th Cir. 1970).

■ The real issue in any environmental case is the long-range public interest. Both parties here really represent the public. The basic question is balancing the need of the travelling public to have I–93 extended from Littleton to Waterford and then to St. Johnsbury (which means a linkup with Interstate

1. The A.M.C. complaint is limited to the Littleton-Waterford segment, while the Society asks an injunction against both segments.

91 to the Canadian Border and on to Montreal, Exhibit 44) against the need of the public to preserve an area unique to New Hampshire and the nation in as near its pristine state as possible.

It is clear that the court has jurisdiction both as to the issues and the parties. Calvert Cliffs' Coord. Com. v. United States Atomic Energy Com., Inc., 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); Citizens to Preserve Overton Park, Inc., et al. v. Volpe, Secretary of Transportation, et al., 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

The plaintiffs allege that the defendants have violated the law in several particulars:

1. That the E.I.S. required by the National Environmental Protective Act (NEPA) is limited to the Littleton-Waterford-St. Johnsbury segments of I-93 only and does not take into consideration the impact of the entire Interstate Highway on Franconia Notch, does not present alternatives to the construction of I-93 through the Notch, and that the E.I.S. for Littleton-Waterford-St. Johnsbury segments were prepared, in fact, by State Highway officials and not the Federal Agency, all contrary to the provisions of 42 U.S.C. § 4332(C) and (D);

2. That the construction of the Littleton-Waterford-St. Johnsbury segments without first completing an E.I.S. of the effects of the entire route on Franconia Notch directly violates the Federal Highway Department's own regulation; PPM 90–1, 23 C.F.R. 1.1, et al, Appendix to Part 1, Page 17, Par. 6; and

3. That the construction of the Littleton-Waterford-St. Johnsbury segments of I–93 is contrary to the spirit and letter of the Parklands Act, 23 U.S.C. § 138, and section (f) of 49 U.S.C. § 1653, both of which statutes are identical.

The A.M.C. also claims a violation of civil rights by the Federal Highway Department for failure to follow its own regulation. I do not think this claim has any merit and it is dismissed.

The defendants take the position that the E.I.S. prepared for the Littleton-Waterford-St. Johnsbury segments are complete and meet all the requirements of the law and that there is no necessity for such statement to take into consideration the impact of Interstate 93 as a whole on Franconia Notch. The defendants also assert that before any new highway of any sort is put through Franconia Notch, a full E.I.S., including the consideration of alternate routes, will be completed and they point to a contract entered into between the State of New Hampshire and VTN Consolidated, Inc., for this purpose, dated June 14, 1974. Exhibit 4B.

The defendants also contend that the Littleton-Waterford-St. Johnsbury segments of I-93 will also serve as an East-West Highway from Berlin to St. Johnsbury, and that such highway is needed regardless of whether or not the Notch is utilized to extend I–93 northerly.

The pertinent provisions of NEPA are:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

\* \* \* \* \* \*

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources,

\*　\*　\*　\*　\*　\*

In order to understand the plaintiffs' claims as to the violations by the defendants of NEPA, it is necessary that the geographical position of Franconia Notch in relation to Interstate Highway 93 be outlined. The New Hampshire portion of Interstate 93 starts at the Massachusetts Line and runs now to Woodstock, New Hampshire, less than three miles south of the entrance to Franconia State Park. The distance through the Park is about eight miles. Exhibit 44. I–93 picks up again about one mile north of the Park and continues from there to Littleton, New Hampshire, where it now terminates. The proposed Littleton-Waterford segment of I–93 will start at Littleton at the terminus of the present 93 and extend for six and one-half miles to Waterford, Vermont. It will then continue for eleven miles from Waterford to St. Johnsbury where it will connect with Interstate 91, which runs to the Canadian Border at Derby Line where it connects with Canadian Highway 55 to Sherbrooke and from thence on Canadian Highway 10 to Montreal, both of which are modern high-speed divided highways. Exhibit 44. It is evident that Franconia Notch stands squarely in the path of I–93 and from an engineering and highway construction point of view, its location invites the final link of I–93 through it. It must be noted that the stretch of I–93 running from one mile north of the Notch to Littleton was completed prior to the passage of NEPA.

The plaintiffs urge that two results will inevitably follow the construction of the Littleton-Waterford-St. Johnsbury segments of I–93: (1) more traffic will be funnelled through the Notch, and (2) the construction of these segments will coerce a decision to build the final link of I–93, or some version of it, through the Notch.

It seems not only probable, but almost inevitable, that the linkup of I–93 to I–91 at St. Johnsbury will result in an increase in automotive traffic through Franconia Notch. This linkup will provide an alternate route to Canada, particularly to Montreal and Quebec City. It is fair to find that at least some motorists who now use Interstate 89 as the highway to Canada will prefer I–93 because of its scenic beauty at the Notch if only a small eight mile section remains a two-lane road. The effect of interstate highways in attracting traffic is by now well established. It seems that such highways not only attract automobiles, but breed them.

The coercive effects on the decision-makers in the Highway Department of having a nearly completed interstate highway to the Canadian Border are also evident. The road through Franconia Notch has, since the early 1800's, been one of the links between Northern, Central, and Southern New Hampshire. The Notch road has long been one of the most favored North-South routes in New Hampshire since the days of horseback and stagecoach. The New Hampshire Highway Department has always favored Route 3, known also as the Daniel Webster Highway, as the main North-South route in the state. It is no accident that I–93 parallels the Daniel Webster Highway through most of New Hampshire. Good highway planning and engineering and the location of population centers have compelled this. Past Governors and the Legislature, as well as highway planners, have envisioned the continuation of I–93 through Franconia Notch. Exhibits 13 and 14. It must be remembered in all fairness that, until recently, interstate highways were regarded by most of us as unmixed blessings and the adverse effects of such roads on our environment and ourselves were understood only by a prescient few.

The completion of I–93 from Littleton to St. Johnsbury will exert irresistible

pressure on the highway planners, no matter how concerned they are about Franconia Notch and how objective they try to be, to complete I–93 by following the natural and historic route through Franconia Notch.

The Environment Protective Agency had precisely this pressure in mind when it wrote to the Federal Highway Administration on August 23, 1973:

> We are concerned with the direct and indirect impacts that the proposed I–93 section will have on Franconia Notch in New Hampshire. There are presently four incomplete sections of I–93: the Littleton, New Hampshire section for which a draft environmental impact statement has been circulated; the Waterford, Vermont section described in this statement; the Manchester, New Hampshire By-pass; and the Franconia Notch section for which Congress recently authorized construction of a parkway. The authorization for the parkway requires " . . . standards which the Secretary determines necessary for the safety of traveling public, for the protection of the environment, and for the park-like and historic character of the Franconia Notch area adjacent to the highway".

> We feel that the cumulative environmental impacts of these projects cannot be adequately evaluated on a piecemeal basis. The construction of this Vermont segment coupled with the construction of the proposed section of I–93 in Littleton, New Hampshire would represent an irreversible commitment to direct interstate and international traffic through the Notch, thus triggering a demand for a much higher level of service through the Notch than would otherwise be required. This will eventually result in increased noise and air pollution levels in the Notch area. Individual statements on this section and on the Littleton, New Hampshire section are not of adequate scope to analyze the cumulative impact of the completion of the I–93 system. For instance, although this draft statement indicates a commitment to the routing of interstate traffic through Franconia Notch, Littleton, New Hampshire, and Waterford, Vermont as shown in Exhibit C, the impacts described pertain only to the localized effects of this particular section. The Waterford section of I–93 was planned in the late 1950's when the nation's level of concern with protecting the environment was low. The National Environmental Policy Act now clearly requires that these prior decisions be re-evaluated utilizing the environmental ethics and environmental tools of the 1970's. The Council on Environmental Quality Guidelines specifically direct Federal agencies to "Look at the overall impact of a large-scale program or chain of contemplated projects (e. g., major lengths of highways as opposed to small segments)." This need was reaffirmed in the decision rendered [sic] the case of Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 [91 S. Ct. 814, 28 L.Ed.2d 136] (1971). Therefore, it is our opinion that an overall assessment must be made of the effects which a completed I–93 system will have on the Notch.

> In summary, a comprehensive statement is needed to relate the incomplete sections of the I–93 with each other and with the system. Environmental impacts should be assessed on a system basis, and the environmental impact of alternative routing plans for international, interstate, and local I–93 traffic should be studied as well. Therefore, we recommend that action on this particular section of I–93 be deferred pending completion of a detailed comprehensive two-state environmental impact statement addressing these issues. Exhibit 10.

The Highway Department's answer that such comments are "specious" without stating the reasons for such a conclusion reflects its own built-in bias and attitude.

Moreover, concerned highway planners in the Federal Highway Department recognized the kind of pressure that their engineers and builders would be subjected to and promulgated a regulation proscribing segmentation of interstate highways.

> The highway section included in an environmental statement should be as long as practicable to permit consideration of environmental matters on a broad scope. Piecemealing proposed highway improvements in separate environmental statements should be avoided. If possible, the highway section should be of substantial length that would normally be included in a multi-year highway improvement program. PPM 90-1.

 An environmental impact statement that is to be effective and meaningful must deal with more than a six and one-half or eleven mile segment of an interstate highway that runs from Massachusetts to the Canadian Border. Interstate highways are used for long distance travel. No interstate highway would be built merely to connect Littleton with St. Johnsbury, Vermont. The purpose of Interstate 93 is to traverse the State of New Hampshire from Massachusetts to the Canadian Border. I-93 really starts in the crowded megalopolis area of Boston and New York City and runs without interruption to Montreal. Exhibit 44. The construction of these two segments without first giving serious consideration to the impact on the Notch and alternate routes as required under 42 U.S.C. § 4332(C) and (D) would not only be shortsighted, but might lead to the eventual destruction of those features that make Franconia State Park so beautiful and unique. The National Environmental Protective Act is to be given a broad and meaningful construction. Protection to the environment has priority over the construction of highways. Named Ind. Mem. of San Antonio Con. Soc. v. Texas Highway Dept., 446 F.2d 1013, 1022-1023 (5th Cir. 1971). In Indian Lookout Alliance v. Volpe, 345 F.Supp. 1167 (S.D.Iowa 1972), the court held:

> I cannot accept the position that the state may divide a project into different components to secure location or design approval and thereby limit the required E.I.S. to a corresponding segment. The considerations which may make it advisable to segment a project for federal approval and financing or for the purpose of construction contracts do not necessarily have any relationship to the environmental impact of the project. To fully appreciate the effect of the segmented division upon the environment an assessment might be required of all or a larger portion of project. I do not believe it would comport with the spirit or intent of NEPA to hold that an E.I.S. is always sufficient if it covers the same area as the segment of the project upon which the state seeks federal approval regardless of the circumstances. At 1170.

Plaintiffs also contend that by attempting to construct I-93 from Littleton to Waterford to St. Johnsbury without first considering alternate routes, the defendants are contravening the Parklands Act, 23 U.S.C. § 138:

> It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After the effective date of the Federal-Aid Highway Act of 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl ref-

uge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

It is significant that the same provision is embodied in 49 U.S.C. § 1653(f) under the general title Transportation. There is no question that the Congress intended that a public park should not be used for highway purposes "unless there is no feasible and prudent alternative to the use of such land, . . ." In discussing these two statutes, the United States Supreme Court said:

> This language is a plain and explicit bar to the use of federal funds for construction of highways through parks—only the most unusual situations are exempted. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 411, 91 S.Ct. 814, 821, 28 L. Ed.2d 136 (1971).

Franconia Notch is a State Park of great natural beauty. The Flume and Basin alone make it unique. But it is the granite ledges high on the flank of Cannon Mountain forming the profile known as the "Old Man of the Mountain" that makes Franconia Notch the site of one of the natural wonders of the world. The profile rocks are now stabilized by pins and cables. Exhibits 23, 24, 25, 26, and 27. No study has been made as to the effect of blasting, construction, and heavy traffic on the fragile rock formation that etches the Old Man against the skyline. The Notch has been the scene of rock slides of sizeable proportions in the immediate past. The scars of such slides are still visible. Exhibits 18, 19, 20, and 21. It would be a crime to take even a slight risk of depriving future generations of the view of this legendary granite face so as to satisfy our present demand for speedy uninterrupted automobile travel.

The judgment of the then Secretary of Transportation John Volpe should be respected and followed by his successors.

I can assure you, however, that any future transportation proposal in the Woodstock-to-Franconia area will require preparation of a comprehensive environmental impact statement involving full consideration of all reasonable alternatives, taking into consideration my earlier refusal to approve the Interstate through the Notch, which I am now reaffirming. (Letter from Volpe to Executive Director of A.M.C., Sept. 29, 1972. Exhibit 37.)

The Assistant Secretary for Environment, Safety, and Consumer Affairs reiterated this position on August 9, 1973:

> Insofar as project I-93-1(1) is concerned, we believe it inappropriate to take any action on this project and its interchange with I-91 at this time. Until the various alternative transportation proposals for I-93 in the Franconia Notch area of New Hampshire have been fully explored, as set forth in former Secretary Volpe's statement of June 13, 1970, any decision on the location of this project would be premature. Exhibit 5.

In seeking to show that there will be no irreparable harm, the defendants point out that construction probably will not start on the Littleton-Waterford-St. Johnsbury segments until 1978 or 1979. The Highway Department would, of course, like to start its land acquisition program as soon as possible. The only construction contemplated in the immediate future is the building of twin bridges over the Connecticut River. The necessity for such construction now is that the present bridge is in a dangerous condition of disrepair. The twin bridges are intended to be part of the Littleton-Waterford segment of I-93 and

one of them is to be constructed so as to serve the present highway.

Although construction will not start for several years on the Littleton-Waterford-St. Johnsbury segments of I–93, if the land is acquired for the road, the certainty of such construction will have the same coercive effect as if the road were being built tomorrow. It is the decision to construct the final segments of I–93 that produces the coercive effect of extending I–93 through the Notch. I am cognizant that my decision may result in delay of the Littleton-Waterford-St. Johnsbury segments of I–93 and additional costs for the acquisition of land, but the purposes and policies of NEPA are that delay is better than hasty and irreversible action. We are beginning to appreciate, perhaps too late, how fragile this planet is and that the wounds inflicted by man to its body can never be healed.

> It is far more consistent with the purposes of the Act to delay operation at a stage where real environmental protection may come about than at a stage where corrective action may be so costly as to be impossible. Calvert Cliffs' Coord. Com. v. United States Atomic Energy Com., Inc., 449 F.2d at 1128.

## FINDINGS AND RULINGS

■ I find that irreparable harm will occur to Franconia Notch and may occur to the Old Man of the Mountain if the Littleton-Waterford-St. Johnsbury segments of I–93 are constructed without first a complete E.I.S. as to the effect of the entire highway on Franconia Notch State Park and the Old Man of the Mountain and a serious study of alternative routes. I rule that such a study is mandated by NEPA and by the Parklands Preservation Act.

I find that construction of a single bridge over the Connecticut River at this time and the necessary land acquisition for it will not result in such irreparable harm.

In the light of these findings, it is not now necessary for me to decide the difficult question of whether the officials of the Federal Highway Department contravened the law by relying too heavily on State Highway personnel in preparing the E.I.S.

I find and rule, based on the law and the evidence, that the plaintiffs will probably succeed on the merits.

A preliminary injunction will, therefore, issue forthwith and is attached as an Appendix to this opinion.

If there is no appeal from this ruling, the Clerk will set the case down for an early hearing on the merits.

So ordered.

## PRELIMINARY INJUNCTION

This cause came on to be heard on plaintiffs' motions for preliminary injunction, and the court having considered the complaints, the affidavits submitted in support of said motions and in opposition thereto, and having heard oral evidence in open court, and it appearing to the court after due deliberation that the defendants are actually engaged in committing and will continue to commit the acts set forth below, to the irreparable injury of Franconia State Park, and the court having made and filed its findings of fact and conclusions of law, it is

Ordered that the defendants Claude S. Brinegar, W. H. White, F. T. Comstock, Jr., Robert H. Whitaker, Reuel T. Webb, and Harland E. Roberts, their agents, servants, employees, and all persons in active concert and participation with them be and they hereby are restrained and enjoined, pending final hearing and determination of this action, from in any manner taking any action:

1. To effectuate federal participation, by providing funding or otherwise, or to commit the United States Government or any of its departments or agencies to such participation, in the highway construction described or proposed in the document entitled "Fi-

nal Environmental Impact Statement, Administrative Action for Interstate 93, Littleton, New Hampshire-Waterford, Vermont" issued by the U. S. Department of Transportation Federal Highway Administration, numbered FHWA–NH–EIS–72–01–F, such proposed construction being of approximately 6.5 miles of Interstate Highway I–93 from Littleton, New Hampshire to Waterford, Vermont;

2. On behalf of the State of New Hampshire or its Department of Public Works and Highways, to construct, or cause to be constructed the highway described in the Final Environmental Impact Statement referred to in paragraph 1, to contract or request bids for such construction, or in any other way to commit the State of New Hampshire or any of its departments or agencies to undertaking, supervising or funding of such construction, provided, however, that the defendants shall not be restrained or enjoined from constructing, or contracting for the construction on behalf of the State of New Hampshire, or otherwise committing the State of New Hampshire to the construction of a single bridge across the Connecticut River, even though such bridge may constitute a portion of the proposed construction project described in the Final Environmental Impact Statement, construction or funding of which is otherwise enjoined in the preceding paragraphs; and

3. To effectuate federal participation, by providing funding or otherwise, or to commit the United States Government or any of its departments or agencies to such participation, in the highway construction described or proposed in the document entitled "Final Environmental Impact Statement, Administrative Action for Interstate Route 93 beginning at the Vermont-New Hampshire State Line in the Town of Waterford, Vermont and extending northerly 11 miles to an intersection with I–91 southeasterly of

St. Johnsbury Village" issued by the U. S. Department of Transportation Federal Highway Administration, numbered FHWA–VT–EIS–73–02–F, such proposed construction being of approximately 11 miles of Interstate Highway I–93 from Waterford, Vermont to St. Johnsbury Village, Vermont.