508 F.2d 927
 7 ERC 1236, 5 Envtl. L. Rep. 20,068
 The CONSERVATION SOCIETY OF SOUTHERN VERMONT, INC., et al., Appellees,
v.
SECRETARY OF TRANSPORTATION, et al., Appellants in No. 73-2629.
The VERMONT NATURAL RESOURCES COUNCIL, INC., et al.,
Appellants in No. 74-2168,
v.
Claude S. BRINEGAR, Secretary of Transportation, et al.,
Appellees, Town of St. Johnsbury, Intervenor-Appellee.
 Nos. 63, 288, 341, Dockets 73-2629, 74-2168, 73-2715.
 United States Court of Appeals, Second Circuit.
 Argued Sept. 17, 1974.
Decided Dec. 11, 1974.
 
 Harvey D. Carter, Jr., Bennington, Vt. (Williams, Witten, Carter & Wickes, Bennington, Vt., R. Paul Wickes, Bennington, Vt., Haynes N. Johnson, Stamford, Conn., Frederick Pope, Jr., Brattleboro, Vt., on the brief), for appellees in No. 73-2699 and appellants in No. 74-2168.
 Robert C. Schwartz, Asst. Atty. Gen., Vt., William B. Gray, Asst. U.S. Atty., Rutland, Vt., Edmund B. Clark, Atty., Dept. of Justice, Washington, D.C. (Wallace H. Johnson, Asst. Atty. Gen., George W. F. Cook, U.S. Atty., D. Vt., Kenneth A. Rubin, Atty., Dept. of Justice, Washington, D.C., on the brief), for appellants in No. 73-2699 and appellees in No. 74-2168.
 Sarah Chasis, Angus Macbeth, New York City, William F. Morrill, Lakeville, Conn., John Souweine, of counsel for amici curiae Natural Resources Defense Council, Inc., in No. 73-2629.
 J. G. Speth, Edward l. Strohbehn, Jr., Washington, D.C., on the brief, for amicus curiae Natural Resources Defense Council, Inc., in No. 74-2168.
 Edward R. Zuccaro, St. Johnsbury, Vt. (Witters, Zuccaro, Willis & Lium, St. Johnsbury, Vt.), for intervenor-appellee.
 Before MOORE, MULLIGAN and ADAMS,* Circuit Judges.
 ADAMS, Circuit Judge:
 
 
 1
 Two cases are consolidated for appeal here because they present an identical issue, namely, whether this Circuit adheres to the holding of Greene County Planning Board v. Federal Power Commission,[1] that an environmental impact statement (EIS) sufficient to satisfy the requirements of the National Environmental Policy Act[2] must be prepared by the reaponsible federal agency. We reaffirm that Greene County remains the law of this Circuit,[3] and that the Federal Highway Administration (FHWA) must formulate and prepare its own impact statement to assess the environmental effects of proposed federally-funded highway projects.
 
 
 2
 I. Background.
 
 
 3
 Objections by environmental groups to proposed Vermont highway construction have generated both these cases, and the defendants in each include the state and federal highway officials.[4]
 
 
 4
 In Conservation Society of Southern Vermont v. Secretary of Transportation, improvement was planned for a twenty-mile segment of U.S. Route 7 between Bennington and Manchester, Vermont. The district court, Circuit Judge Oakes sitting by designation, granted a permanent injunction in 1972 against proceeding with construction pending compliance with the mandate of NEPA.[5] In 1973, the federal defendants, asserting procedural and substantive compliance with NEPA, moved to dissolve the Route 7 injunction. That motion was denied. Federal participation in preparation of the EIS, Judge Oakes concluded, was scant, perfunctory and insufficient to satisfy the procedures of NEPA as that Act was interpreted in Greene County.[6]
 
 
 5
 Judge Oakes found that the ultimate conversion of the Route 7 corridor into a divided limited-access superhighway through Connecticut, Massachusetts and Vermont is not the subject of an existing federal plan. However, he found that it is nonetheless viewed by the respective state highway departments as a goal 'possible of accomplishment with legislative and federal approval over a long-range period of time, with federal approval taking place on an ad hoc basis at the division engineer level.' 362 F.Supp. at 636. The district court determined that the FHWA has knowledge of each state's planning process and acts in a 'partnership' with the officials of each state respectively. Conversion of isolated portions of Route 7 into a superhighway, the court stated, will produce greater traffic, thus creating synergistic pressure for further construction to connect the newly expanded sections.
 
 
 6
 The district court therefore held that before the contemplated construction was undertaken, a comprehensive exploration into the environmental impact of development alternatives through the 280 mile corridor was called for. Judge Oakes concluded that there was justification for his order both under NEPA and under the Intergovernmental Cooperation Act of 1968.[7] This appeal by defendants followed.
 
 
 7
 In the companion case, Vermont Natural Resources Council v. Brinegar, an appeal is taken by environmentalist-plaintiffs from rulings of District Judge Coffrin on several issues relating to a proposed construction denominated the Sleepers River Interchange.[8] The interchange, to be located in St. Johnsbury, Vermont, would provide a highway connection for motorists between U.S. Route 2 (an east-west road) and Interstate I-91 (a north-south road). Without the interchange, those who wished to transfer from one highway to the other would have to leave the highway and pass through the narrow streets of St. Johnsbury. The two principal roadways, Route 2 and I-91, are presently under construction; the sole project at issue before this Court is the proposed interchange.
 
 
 8
 As envisaged, building the St. Johnsbury interchange would require the channelization[9] of approximately one mile of Sleepers River. The environmentalists sought to enjoin the project because of alleged failures by defendants to comply with federal law. They alleged procedural and substantive violations of NEPA 102(2)(c).[10] Before the trial court, and here, that the draft and final EIS were prepared by the state agency rather than by the federal agency and observed that, contrary to statute, the EIS did not consider alternatives to the construction. While conceding certain shortcomings in the EIS, the district court found the construction essential and declined to issue an injunction. Noncompliance with the permit requirements of the Federal Water Pollution Control Act of 1972[11] is also pressed on this appeal as grounds for enjoining further work on the interchange. The district court found that plaintiffs could not maintain such cause of action because they had not satisfied a sixty-day notice requirement established by the Pollution Control Act as a precondition to private suit.[12]
 
 
 9
 II. The 'Responsible Official' to Prepare the EIS.
 
 
 10
 Consideration of environmental factors in planning major federal projects has been deemed a high national priority. The duty of a federal agency under NEPA is to produce, as part of a determination whether to proceed with a project, a detached and comprehensive analysis of the impact on the environment of such project.[13]
 
 
 11
 In Greene County, supra, the New York Power Authority, in accordance with the regulations of the Federal Power Commission, prepared and filed with the Commission an impact statement to accompany an application for a new power line. The Commission reviewed and circulated the statement that had been prepared by the Authority, a state agency, in alleged satisfaction of its duty under NEPA. Chief Judge Kaufman held that in so doing, the Federal Commission:
 
 
 12
 abdicated a significant part of its responsibility by substituting the statement of (the state agency) for its own. The Commission appears to be content to collate the comments of other federal agencies, its own staff and the intervenors and once again to act as an umpire. The danger of this procedure, and one obvious shortcoming, is the potential, if not likelihood, that the applicant's statement will be based upon self-serving assumptions.[14]
 
 
 13
 NEPA, Chief Judge Kaufman stated, 'explicitly requires the (federal) agency's own detailed statement' of the expected environmental impact of a major federal action.[15] The Act places 'primary and nondelegable responsibility' for preparation of the EIS on the federal agency.[16] Accordingly, Greene County held that, to the extent regulations of the Federal Power Commission did not implement Congressional policy, compliance with the Commission's regulations would not satisfy NEPA.
 
 
 14
 In the highway cases presently before us, the FHWA is the initial decision maker under the Act. While it does not plan, design or construct highways, FHWA decides whether the commitment of millions of dollars of federal money should be allocated to specific highway projects. Accordingly, having carefully considered the Act, the regulations and precedent, we conclude that FHWA is in the best position to weigh the costs to the environment and the benefits hoped for from the project and then to reach, as it must, a decision based on 'its own evaluation of the environmental issues.'[17]
 
 
 15
 A state agency is established to pursue defined state goals. In attempting to secure federal approval of a project, 'self-serving assumptions' may ineluctably color a state agency's presentation of the environmental data or influence its final recommendation. Transposing the federal duty to prepare the EIS to a state agency is thus unlikely to result in as dispassionate an appraisal of environmental considerations as the federal agency itself could produce. Judge Oakes declared that:The Vermont Highway Department has the duty . . . to follow legislative mandate in regard to proposed highway construction, and the construction here contemplated (Route 7) was legislatively mandated in 1968. Thus, it is impossible for the Vermont Highway Department not to be an advocate of legislatively mandated construction and still act consistently with its duty as a state agency.[18]
 
 
 16
 Requiring strict adherence to the Greene County rule would provide a clear and effective means to obtain an objective, comprehensive EIS. Furthermore, the beneficial effects of such an approach are substantial.
 
 
 17
 Appropriate agency regulations on EIS authorship . . . would shift the initial burden of monitoring compliance with this aspect of NEPA to the agencies themselves, while facilitating ultimate judicial evaluation of such compliance . . .. The case-by-case approach . . . tends to encourage even more NEPA litigation, while at the same time increasing the chance that a legally insufficient EIS might for lack of litigation become the basis for federal decisions made in ignorance of potentially disastrous environmental consequences.[19]
 
 
 18
 Lodging primary responsibility with the federal gencies would clarify definitively the respective roles of agency and court in effectuating the Congressional purposes. By assuring unambiguous rules, judicial intrusion into what are in essence agency determinations will be avoided wherever possible.[20]
 
 
 19
 Further litigation before this Court should be rendered unnecessary, or at least kept to a minimum, regarding whether 'significant federal participation' or 'substantial interaction' between federal and state agencies satisfy NEPA requirements. Nothing short of 'genuine'[21] federal preparation of the EIS accords with Greene County.
 
 
 20
 The interpretation of the statute by the Council on Environmental Quality, CEQ, has been expressly accommodated to the Greene County result.[22] The CEQ guidelines presently read:
 
 
 21
 7(c). Where (a federal) agency relies on an applicant to submit initial environmental information, the agency should assist the applicant by outlining the types of information required. In all cases, the agency should make its own evaluation of the environmental issues and take responsibility for the scope and content of draft and final environmental statements.[23]
 
 
 22
 It is objected that a stringent rule requiring FHWA preparation of the EIS is unmanageable from a practical viewpoint. Upon careful review, however, it would appear that the problems entailed in conforming to Greene County are tractable.[24]
 
 
 23
 It is contended that the FHWA is not involved in planning a particular project from the earliest stages, and thus does not have the advantage of information available to the state. This handicap is minimized however, for the CEQ guidelines explicitly preserve sufficient flexibility for the federal agency to solicit and integrate information from state agencies.[25] Surely there is no reason to lose the benefit of any work done by the state during initial exploration into project possibilities prior to federal involvement.
 
 
 24
 Turning now to the cases before the Court, in Conservation Society of Southern Vermont, we affirm the judgment of Judge Oakes that the requisite EIS be prepared by the FHWA, the responsible federal agency. The injunction prohibiting construction of Route 7 will continue until the requisite EIS is prepared in compliance with the district court order.
 
 
 25
 In Vermont Natural Resources Council a significantly different factual context is presented. To the extent that the district court questioned the need for FHWA compliance with Greene County, its opinion is not sustained. But the district court ascertained that, in any event, several factual considerations combined to justify withholding an injunction. Since we have resolved that the district court did not abuse its discretion in making its determination, we affirm the result reached below on this point.[26]
 
 
 26
 In determining whether to issue an injunction against proceeding with the Sleepers River Interchange, Judge Coffrin found that, under the circumstances, the equities largely favored the defendants. The court pointed to the late stage reached by the general construction program,[27] to the very strong considerations of public safety urged by St. Johnsbury into whose streets the I-91 highway traffic must otherwise empty, and to the urgency attending completion of this project.
 
 
 27
 Although the procedural requirements of NEPA must be followed scrupulously[28] and cost or delay will not alone justify noncompliance with the Act,[29] where the equities require, it remains within the sound discretion of a district court to decline an injunction, even where deviations from prescribed NEPA procedures have occurred.[30] We cannot conclude, based on its factual determinations and its weighing of the equities, that the district court abused its discretion in refusing to enjoin construction of the Sleepers River Interchange.
 
 III. EIS for the Route 7 Corridor
 
 28
 The defendants appeal from the portion of the order in Conservation Society of Southern Vermont that, within six months from issuance by the FHWA of the EIS relating to the 20 mile project, an EIS concerning development of transportation systems in the entire 280 mile Route 7 corridor must be prepared.[31]
 
 
 29
 Although no plan presently exists for constructing a Route 7 superhighway through Connecticut, Massachusetts and Vermont, the district court made particular findings indicating a long-range goal of superhighway construction by the respective states and the federal government, acting in partnership.[32] Development is apparently foreseen as the piecemeal connection of amaller segments, each considered on an ad hoc basis. It appeared that the FHWA would not consider a comprehensive corridorlong EIS necessary because the highway as an entity would never be characterized as a 'major Federal action.'[33] Judge Oakes emphasized the undesirable consequences if each isolated increment is approved in ignorance both of the cumulative environmental impact of fragmented growth and of major transportation alternatives that might be planned in lieu of highway construction.[34]
 
 
 30
 The government advances the contention that the scope of the EIS required by the district court is excessive, first, in view of the nonexistence of any present plans to build the three-state highway, and second, in light of the relatively small portion of road reviewed here.[35]
 
 
 31
 Under the facts as found, we would not disturb the district court's conclusion that an ultimate Route 7 superhighway is the expectation of state agencies with the knowledge and cooperation of the federal government. We thus must reach the second issue, whether it was beyond the sound exercise of discretion of the district court to order an EIS considerably greater in scope than the specific project before the agency at this time.
 
 
 32
 Support for the order below may be found in NEPA, which provides that the EIS include consideration of the relation between short and long term uses of the environment, especially where 'irreversible and irretrievable commitments of resources' will follow from approval of the proposed project.[36] NEPA also requires that federal agencies 'recognize the worldwide and long-range character of environmental problems.[37] For consideration of environmental factors 'to the fullest extent possible', CEQ requires review 'beginning at the earliest possible point.'[38] CEQ reminds agencies that, to be meaningful, impact statements 'are to serve as the means for assessing the environmental impact of proposed agency actions, rather than as a justification for decisions already made.'[39]
 
 
 33
 The appropriateness of ordering impact statements for entire development programs when a proposal before an agency concerns only one portion of a more massive undertaking is not a novel issue in the courts.[40] In Scientists' Institute for Public Information v. AEC,[41] the plaintiffs sought to force AEC to prepare an EIS regarding a liquid metal fast breeder reactor program to develop fuel for nuclear-powered electric generators. The AEC conceded that at some future time prior to the construction of generator plants an EIS would be required, but the agency ascertained administratively that the program, still in the research and development stages, was not ripe for preparation of an EIS. The Court of Appeals for the District of Columbia disagreed. It reasoned that developments presently occurring required the 'irreversible and irretrievable commitments of resources,' and that these commitments themselves would curtail subsequent broad-scale assessment of alternatives.[42]
 
 
 34
 Judge Oakes was equally concerned with the irretrievable commitment of federal funds to local highway projects without early attention to possible alternatives to highway development. Furthermore, in contrast to the situation in Scientists' Institute, where it was clear that an EIS would be forthcoming at some time covering the reactor program, in the Route 7 case it appears that no overall impact statement in likely to emerge spontaneously from the FHWA.
 
 
 35
 The Bennington-Manchester Road is admittedly a project with local utility. Accordingly, the government asserts that by submitting an EIS for this segment compliance is established with the NEPA mandate to consider the environment from a broad perspective. The FHWA guidelines themselves would seem to answer this contention. Guidelines on the scope of an EIS provide:
 
 
 36
 The highway section included in an environmental statement should be as long as practicable to permit consideration of environmental matters on a broad scope. If possible, the highway section should be of substantial length that would normally be included in a multi-year highway improvement program.[43]
 
 
 37
 Upon careful consideration of the facts, and with a sensitive eye to the options often imperceptibly foreclosed by fragmented growth, we conclude that the legislation, the regulations and precedent appear to afford ample basis for Judge Oakes' determination.[43] The court thus did not abuse its discretion in concluding that the time was appropriate for early, comprehensive and meaningful consideration of the environmental impact of an alternative to continued highway expansion in the Route 7 corridor.[44]
 
 
 38
 IV. Consideration of Alternatives at Sleepers River
 
 
 39
 An attack was leveled by plaintiffs in Vermont Natural Resources on the substantive adequacy of the EIS for the Sleepers River Interchange because the EIS did not consider, as required by NEPA, other route locations or the alternative of abandoning the project.[45] NEPA's mandate is clear that agencies must accord thorough heed to the environmental impact of reasonably available options prior to a formal determination to pursue a course of action.[46] While consideration of every conceivable afternative is not necessary, 'what is required is information sufficient to permit a reasoned choice of alternatives . . ..'[47] Generally an EIS must consider the possibility of doing nothing as well as various ways to achieve a certain end.[48]
 
 
 40
 The EIS here, in violation of NEPA, did not include a discussion of the environmental impact of not building the Sleepers River Interchange. Despite this failure, a constellation of facts contributed to the district court's conclusion that no injunctive relief was warranted in the case before it. Plaintiffs contend that a clear violation of NEPA justified injunctive relief against defendants pending compliance with the statute. Ordinarily, we would not take issue with a rule that, where other things are equal, a clear violation of a statute embodying a strong national policy merits injunctive relief. But here the district court found that the equities clearly and strongly favored the defendants.
 
 
 41
 Three grounds, each supported by the record, provided the basis for the district court's result. We need not decide today whether fewer than the sum of these would justify withholding injunctive relief, for here all were present.
 
 
 42
 First, the district court found that the general I-91 highway project and the Sleepers River Interchange were at an advanced stage of completion. I-91 when complete will provide highway transportation in Vermont from the Massachusetts border north to Canada. Most of the construction phase is ended and all but 24 miles of I-91 are in operation in Vermont.[49] The I-91 portion to be serviced by the interchange was almost finished, and the interchange was found necessary to provide adequate access to I-91. The land acquisition program for the interchange right of way was accomplished. Contracts had been let and construction had begun except for actual diversion of the river bed.[50]
 
 
 43
 Second, granting an injunction appeared unjustified where the outcome was virtually undisputed, where the affected resource was not 'so environmentally unique (as to require) any special consideration,'[51] and where extensive and thoughtful consideration had been given to mitigating the adverse environmental consequences of the project. Thus, the court found that the interchange was essential 'for the benefit of the traveling public and the effective utilization of I-91'[52] as well as for the safety and general welfare of the citizenry of St. Johnsbury. Elimination of the interchange, the court found, was 'a very remote possibility'[53] and alternative proposals were 'impossible to realistically implement because of adverse terrain.'[54] Further, in preparing plans for the actual construction, exhaustive efforts had been expended to preserve the ecological value of the river, notwithstanding the channelization.[55]
 
 
 44
 Third, Judge Coffrin found that the heavy damage to defendants to be expected from an injunction militated against its issue. Delay and concomitant cost increases would not alone justify noncompliance with the Act.[56] Here, however, the court found that until the interchange was complete the town bore an 'impermissibly heavy traffic burden,'[57] compromising the quality of life in the town and the safety of its inhabitants. Also, construction would provide jobs in an area of high unemployment.[58] On the other hand, the delay occasioned by an injunction would be especially costly because of the curtailed construction season in northern Vermont, which would, in effect, postpone the job an entire year, although a far shorter period might be required to comply with NEPA.
 
 
 45
 The district court gave the above reasons for withholding injunctive relief notwithstanding the violation of NEPA in regard to contemplation of alternatives in the EIS for the Sleepers River Interchange. When all the pertinent facts are considered, we cannot say the district court abused its discretion in so deciding.[59]
 
 V. The Federal Water Pollution Control
 Act Claim
 
 46
 The plaintiffs in Vermont Natural Resources Council also contend that the district court erred by concluding it lacked jurisdiction to entertain a claim that defendants' channelization of Sleepers River violated the Federal Water Pollution Control Act (FWPCA) Amendments of 1972.[60] The court concluded that only by waiting sixty days after giving notice to the administrator, the state, and the alleged violator as required by the statute[61] could plaintiffs obtain review of the defendants' actions.
 
 
 47
 After careful consideration we are not persuaded that Congress intended the sixty-day notice provision to erect an absolute barrier to earlier suit by private citizens under the FWPCA.[62] However, we decline to remand the case for a determination of the merits of plaintiffs' claims. Assuming arguendo that the district court had jurisdiction[63] over the FWPCA claims and, assuming further that a stream channelization project such as the one here would require a permit under the Act, we would not employ the equitable powers available to this Court to enjoin further construction of the Sleepers River Interchange until such a permit is obtained. As already pointed out, granting such an injunction would cause serious harm and inconvenience both to St. Johnsbury and to the general travelling public. The purposes which would be served by enjoining construction at this late date are simply not sufficiently weighty to balance the injury which further delays would cause.
 
 
 48
 Accordingly, the judgment of the district court in each of these cases will be affirmed.
 
 
 
 *
 Of the Third Circuit Court of Appeals, sitting by designation
 
 
 [1]
 455 F.2d 412 (2d Cir.), cert. denied 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972)
 
 
 [2]
 42 U.S.C. 4321 et seq. (1973) (NEPA)
 
 
 [3]
 Contra, Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir. 1973), cert. denied 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); Citizens Environmental Council v. Volpe, 484 F.2d 870 (10th Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); Lowa Citizens for Environmental Quality, Inc. v. Volpe, 487 F.2d 849 (8th Cir. 1973); Finish Allatoona's Interstate Right, Inc. v. Brinegar, 484 F.2d 638 (5th Cir. 1973); Movement Against Destruction v. Volpe, 500 F.2d 29 (4th Cir. 1974)
 
 
 [4]
 The Town of St. Johnsbury is the defendant-intervenor in Vermont Natural Resources Council. In both cases briefs by amici curiae have been filed and considered
 
 
 [5]
 343 F.Supp. 761 (D.Vt.1972). The holding that there had been noncompliance with 4(f), Department of Transportation Act of 1966, 49 U.S.C. 1653(f), which served as a basis for the original injunction, is not questioned in this appeal
 
 
 [6]
 'There is no indication whatsoever that FHWA or any of its employees conceived, wrote or even edited any section of or passage in the EIS.' 362 F.Supp. 627, 632 (D.Vt.1973)
 In contrast to the procedural shortcoming of the EIS, the district court found that substantively the EIS was adequate. There is no appeal from this aspect of the district court opinion.
 
 
 [7]
 42 U.S.C. 4231(b), (e) (1973)
 
 
 [8]
 D.Vt., Civ. No. 74-149, order entered Aug. 16, 1974, opinion filed Aug. 21, 1974 (Coffrin, J.). The district court in effect bifurcated the proceedings to enable speedy disposition of the Sleepers River Interchange controversy, designated a matter of 'considerable urgency.'
 By order dated Aug. 26, 1974, a stay pending appeal was issued by a panel of this Circuit pursuant to F.R.App.Proc. 8. The stay was dissolved by the present panel, in an order dated October 23, 1974.
 
 
 [9]
 Channelization of a stream, in the context employed here, involves the creation of an artificial stream bed and diversion of a stream from its natural course to the constructed waterway. From perspectives of engineering, ecology and aesthetics, clearly a broad spectrum is comprehended in the term 'channelization.'
 
 
 [10]
 42 U.S.C. 4332(2)(C) (1973)
 
 
 [11]
 33 U.S.C. 1311, 1344 (Supp.1974)
 
 
 [12]
 A claim under the Federal Rivers and Harbors Act, 33 U.S.C. 403, 407 (1970), rejected by the court below, was not pursued in this appeal
 
 
 [13]
 42 U.S.C. 4332(2)(C), NEPA Section 102(2)(C), provides in full:
 Sec. 102. The Congress authorizes and directs that, to the fullest extent possible: . . . (2) all agencies of the Federal Government shall--
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 Prior to making any detailed statement, the responsible Federal Official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes.
 
 
 [14]
 455 F.2d at 420
 
 
 [15]
 Id. at 421
 
 
 [16]
 Id. at 420
 
 
 [17]
 Council on Environmental Quality (CEQ) Guidelines, 38 Fed.Reg. 20553 (1973)
 
 
 [18]
 362 F.Supp. at 631
 
 
 [19]
 1-291 Why? Ass'n v. Burns, 372 F.Supp. 223, 246, n. 72 (D.Conn.1974), appeal filed No. 74-1545 (2d Cir. Feb. 7, 1974)
 
 
 [20]
 See, Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 838 (1972)
 
 
 [21]
 362 F.Supp. at 632
 
 
 [22]
 38 Fed.Reg. 10856, 10865 (1973) (statement accompanying proposed guidelines for the preparation of an EIS; comments to 7(d))
 
 
 [23]
 Fed.Reg. 20550, 20553 (1973), codified as 40 CFR 1500.7(c). The guidelines do permit 'the use (after review) of initial information furnished by an applicant in the form of an EIS.' 38 Fed.Reg. 10865
 The CEQ published FHWA Policy and Procedure Memorandum (PPM) 90-1 two years prior to issuance of its revised guidelines (102 Monitor, Vol. 1, No. 9, Oct. 1971). Such earlier publication does not provide evidence that CEQ presently approves the procedures outlined in PPM 90-1. The more likely inference is that the 1973 guidelines were intended by CEQ to stimulate agency revision of internal procedures inconsistent with judicial and CEQ interpretations of the Act.
 
 
 [24]
 Shortages of both general and expert personnel are cited. However, we agree with the district court in Southern Vermont that this difficulty is best addressed to Congress. 362 F.Supp. at 361. Testimony on behalf of the Vermont Highway Department indicated that the FHWA already absorbs that share of the cost of EIS preparation commensurate with its underwriting of construction costs. It has been suggested that states might be asked to continue to pay their portion of costs when the FHWA prepares the EIS. No financial constraints operating on FHWA would thus hamper their ability to prepare the EIS. See Comment, The Independent Offices Appropriations Act of 1952; Who Should Pay for the Impact Statement, 3 E.L.R. 10059 (1973); Comment, More on the Independent Offices Appropriations Act of 1952, 3 E.L.R. 10086 (1973). The Supreme Court recently approved a fee assessment by a federal agency under the Appropriations Act. National Cable Television Assoc., Inc. v. United States, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974)
 
 
 [25]
 Notes 22, 23, supra
 
 
 [26]
 It would appear that the district court was moved in part at least by what it perceived as significant federal interaction in the preparation of the EIS. In contradistinction to Conservation Society, Judge Coffrin found that federal-state cooperation was 'much more extensive.' Slip Opinion 15. Federal review of the fraft EIS was described as 'searching.' Slip Opinion at 12. In addition, federal agency contributions incorporated into the final EIS were found to be substantial
 While the level of involvement described does not reach the standard reaffirmed by this Court today, Judge Coffrin's findings in this regard help sustain his decision not to enjoin construction in the Sleepers River case until a properly prepared EIS is available.
 
 
 [27]
 Design approval for the I-91 construction was prior to Feb. 1, 1971. I-91 construction in Vermont was in its final phase. Even as to the interchange project at issue here, land acquisition has been completed, contracts have been awarded and construction has begun. Slip Opinion 5-6, 22, n. 1
 
 
 [28]
 Calvert Cliffs' Coordinating Committee v. AEC, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); Greene County, supra; City of New York v. United States, 344 F.2d 929 (E.D.N.Y.1972) (3-judge court, Friendly, J.)
 
 
 [29]
 Calvert Cliffs', supra; Greene County, supra; Environmental Defense Fund, Inc. v. Froehlke, 477 F.2d 1033 (8th Cir. 1973)
 
 
 [30]
 In Greene County, the court held that as to certain portions of the power line construction, 'There can be no question that the Commission failed to comply with NEPA . . . . Nevertheless we find no compelling basis for halting construction of the lines so far (80%) advanced . . .' 455 F.2d at 424-425. See also Environmental Defense Fund, Inc. v. Froehlke, 477 F.2d 1033 (8th Cir. 1973), and cases cited therein
 
 
 [31]
 362 F.Supp. at 638
 
 
 [32]
 Id. at 636
 
 
 [33]
 42 U.S.C. 4332(2)(c)
 
 
 [34]
 The defendants would cast this determination by the district court as an intrusion into FHWA decision-making inconsistent with the limited scope of review afforded substantive matters. The failure of the FHWA to provide any impact statement regarding the entirety of what the district court found to be an ongoing, albeit piecemeal, development is not so sheltered from judicial review. Scientists' Institute for Public Information, Inc. v. A.E.C., 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973); Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972); City of New York v. United States (II), 344 F.Supp. 929 (E.D.N.Y.1972) (3-judge court)
 
 
 [35]
 The Bennington-Manchester Route 7 project is approximately 20 miles in length
 
 
 [36]
 42 U.S.C. 4332(2)(C)(iv), (v)
 
 
 [37]
 42 U.S.C. 4332(2)(E). The Senate report accompanying NEPA states expressly that one function of the Act is to prevent decision-making that affects the environment to take place 'in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades.' S.Rep.No.91296, 91st Cong., 1st Sess. 5 (1969)
 
 
 [38]
 38 Fed.Reg. 10856, 10865 (1973)
 
 
 [39]
 38 Fed.Reg. 20550, 20552 (1973). 40 C.F.R. 1500.2(a) mandates that 'in all cases prior to agency decision' a detailed EIS is necessary. Courts also have required impact statements prior to decision-making by agencies. Calvert Cliffs', supra, described tardy consideration of environmental factors as a 'hollow exercise.' 499 F.2d at 1128
 See also Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir.), cert. denied, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972); Citizens Env'l Council v. Volpe, 364 F.Supp. 286, 293-294 (D.Kan.), aff'd, 484 F.2d 870 (10th Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); Citizens for Clean Air v. Corps of Engineers, 349 F.Supp. 696, 708 (S.D.N.Y.1972).
 
 
 [40]
 The related question of artificial division of a project into smaller segments for approval is considered in Indian Lookout Alliance v. Volpe, 484 F.2d 11 (8th Cir. 1973), and Named Individual Members v. Texas Highway Dept., 446 F.2d 1013 (5th Cir. 1971), cert. denied, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136 (1972). The test for whether an isolated highway segment is the proper subject of an EIS appears to be whether the segment has an independent utility, whether it has logical functional termini. PPM 90-1 3(a)
 
 
 [41]
 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973)
 
 
 [42]
 Id at 1092. See also Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 835 (1972)
 
 
 [43]
 PPM 90-1 P6
 43A In a recent per curiam opinion, this Circuit affirmed a district court determination relating to a portion of the Route 7 corridor between Danbury and New Milford, Connecticut. Citizens for Balanced Environment and Transportation, Inc. v. Volpe, 503 F.2d 601 (2d Cir. 1974). In that case the district court dealt solely with the question of whether or not there was federal action in the construction of the Danbury-New Milford portion of Route 7; it did not consider the issue of the necessity for an EIS covering the entire corridor. Thus, the affirmance by this Court of Judge Newman's specific finding does not preclude, and is unaffected by, the present affirmance of Judge Oakes' general findings.
 
 
 [44]
 Since we affirm the district court's requirement of a corridor-long EIS based on NEPA, we do not reach the question whether such order might be bottomed on the additional basis asserted by the district court, namely, the Intergovernmental Cooperation Act of 1968, 42 U.S.C. 4231 (1973)
 
 
 [45]
 The EIS shall include a detailed statement of 'any adverse environmental effects which cannot be avoided should the proposal be implemented.' as well as 'alternatives to the proposed action.' 42 U.S.C. 4332(2)(C)
 All federal agencies are required to 'study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.' 42 U.S.C. 4332(2)(D). See also S.Rep.No.91-296, 91st Cong., 1st Sess. 21.
 
 
 [46]
 Citizens Environmental Council v. Volpe, 484 F.2d 870 (10th Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974); Monroe County Conservation Council, Inc. v. Volpe, 472 F.2d 693 (2d Cir. 1972); Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972); Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 385, 463 F.2d 783 (1971)
 
 
 [47]
 Natural Resources Defense Council, Inc. v. Morton, supra
 
 
 [48]
 Monroe County Conservation Council, Inc., supra
 
 
 [49]
 It was stated at oral argument without contradiction that approximately 80%, or 3,900 feet of the 4,800 foot-long channelization of Sleepers River was attributable to the I-91 construction to which no objections are raised
 
 
 [50]
 The late stage at which this construction has been subjected to attack provides a vivid contrast to the situation in Southern Vermont, the companion case here, where the district court ordered early contemplation of alternatives, permitting a more meaningful appraisal. Greene County, supra; Arlington Coalition on Transportation, supra; Calvert Cliffs', supra
 
 
 [51]
 Dist. Court slip opinion at 24. The Court noted that although six alternative routes were suggested in the final EIS for the remaining 24 miles of I-91, all contained identical plans for the Sleepers River Interchange
 
 
 [52]
 Id. at 23
 
 
 [53]
 Id. at 24
 
 
 [54]
 Id. at 19
 
 
 [55]
 Id. at 21-24. In the course of review prior to issuance of the final EIS, there had been meetings with the U.S. Department of Interior Fish & Wildlife Service and the Vermont Fish & Game Department. Many aspects of construction were tailored to incorporate suggestions to alleviate the environmental impact of channelization, directed to flood control and the preservation of the fishing, recreational and aesthetic value of the stream. Some of the modifications involved placing a natural boulder fill in the channel, designating the steepness of the banks and the depth of the channel, and planting shade trees to keep down water temperature, to hold the soil and to promote the growth of other vegetation
 
 
 [56]
 Greene County, supra; Calvert Cliffs', supra
 
 
 [57]
 Slip opinion at 18
 
 
 [58]
 Id, at 35. This would appear to be of no consequence if the ultimate outcome were in substantial doubt, but such was not found to be the case
 
 
 [59]
 Aberdeen & Rockfish RR. Co. v. Students Challenging Regulatory Agency Proceedings (SCRAP), 409 U.S. 1207, 1218, 93 S.Ct. 1, 34 L.Ed.2d 21 (1972) (Burger, C.J., sitting as Circuit Justice)
 
 
 [60]
 33 U.S.C. 1251 et seq. (Supp.1974)
 Section 1311(a) provides:
 Except in compliance with this section and (section 1344) of this title, the discharge of any pollutant by any person shall be unlawful.
 Section 1344(a) states:
 (a) The Secretary of the Army, acting through the Chief of Engineers, may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites.
 'Pollutant' is defined in 33 U.S.C. 1362(6) to include dredged spoil, rock, and sand.
 
 
 [61]
 33 U.S.C. 1365(a) reads in pertinent part:
 Any citizen may commence a civil action on his own behalf--
 (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter . . ..
 33 U.S.C. 1365(b) reads:
 No action may be commenced--
 (1) under subsection (a)(1) of this section--
 (A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order . . ..
 
 
 [62]
 See Natural Resources Defense Council, Inc. v. Train, 510 F.2d 692 (D.C.Cir.1974). Ordinarily, the 60-day notice provisions must be adhered to prior to initiation of suit under the FWPCA. The purpose of the 60-day notice procedure of 1365 is to provide the Administrator time to launch governmental enforcement of the FWPCA in lieu of enforcement through private citizens suits. See Sen.Rep.No.92-414, 92nd Cong., 1st Sess., 79-80 (1971); 1972 U.S.Code Cong. & Admin.News 3668, 3745
 However, a crabbed construction of 1365 which would elevate the 60-day rule to the position of an absolute barrier to earlier suit fails to account for 1365(e), which preserves all private rights to sue for relief under any statute, or common law. Moreover, a review of the legislative history of 1365 and its prototype, 304 of the Clean Air Act, supports the conclusion that the provisions for obtaining judicial review set forth in 1365 were not intended to eliminate avenues previously available to citizens seeking enforcement of the Act, but were rather intended to provide citizens with an additional remedy. Section 304 of the Clean Air Act, 42 U.S.C. 1857h et seq., was the model for the citizen-suit provision of the FWPCA, and is substantially identical to 505 of the FWPCA. See Sen. Comm. on Public Works (Library of Congress) A Legislative History of the Federal Water Pollution Control Act Amendments of 1972, 93d Cong., 1st Sess. (Jan. 1973) (2 vols.), at 820, 1497. See Sen. Comm. of Public Works, A Legislative History of the Clean Air Amendments of 1970, 93d Cong., 2d Sess. (Jan. 1974) (2 vols.) at 436-439.
 Although it appears that no court has expressly ruled on whether the 505 procedure is the exclusive means of obtaining review of agency action under the FWPCA, district courts have in fact exercised jurisdiction over FWPCA claims based on other jurisdictional statutes. See, e.g., Scenic Hudson Preservation Conference v. Callaway, 370 F.Supp. 162 (S.D.N.Y.1973), aff'd 499 F.2d 127 (2d Cir. 1974) (establishing jurisdiction to grant permanent and injunctive relief for alleged violation of 404 of FWPCA under 28 U.S.C. 1331 and the APA, 5 U.S.C. 701-706); Natural Resources Defense Council, Inc. v. Quarles, (Civil No. 1629-73, D.D.C., Feb. 1, 1974). See also City of Highland Park v. Train, 374 F.Supp. 758 (N.D.Ill. 1974), in which the court held that it had jurisdiction under 28 U.S.C. 1331 to review the failure of the EPA Administrator to promulgate regulations in conformity with the Clear Air Act, 42 U.S.C. 1857 et seq.
 Abbott Laboratories v. Gardner announces the standard to be applied:
 Judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress.
 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). See also PBW Stock Exchange, Inc. v. SEC, 485 F.2d 718, 733 (3d Cir. 1973) (dissenting opinion).
 Since a 'persuasive reason' does not appear in this case, the notice requirements of 505 would not operate as a total jurisdictional bar to entertaining plaintiffs' claim.
 
 
 [63]
 Plaintiffs assert that the district court had jurisdiction to review under either the federal question statute, 28 U.S.C. 1331, or the Administrative Procedure Act, 5 U.S.C. 701-706