**APPALACHIAN MOUNTAIN CLUB** et al.

v.

Claude S. **BRINEGAR**, Secretary of
Transportation, et al.

**SOCIETY FOR the PROTECTION OF
NEW HAMPSHIRE FORESTS** et al.

v.

Claude S. **BRINEGAR**, Secretary of
Transportation, et al.

**Civ. A. Nos. 74–208, 74–219.**

United States District Court,
D. New Hampshire.

March 25, 1975.

Frederic K. Upton, Upton, Sanders & Smith, Concord, N. H. Samuel Hoar, Goodwin, Procter & Hoar, Boston, Mass., Harvey D. Carter, Jr., Williams, Witten, Carter & Wickes, Bennington, Vt., for plaintiffs.

John C. Boeckeler, Asst. Atty. Gen., State of New Hampshire, Concord, N. H., Gary B. Randall, Land and Natural Resources Div., General Litigation Section, Dept. of Justice, Washington, D. C., Joseph M. Kerrigan, Hamblett, Kerrigan, LaTourette & Lopez, Nashua, N. H., for defendants.

## OPINION

BOWNES, District Judge.

Plaintiffs seek to enjoin construction of the Littleton-Waterford segment of Interstate 93 pending the completion and approval of an Environmental Impact Statement (EIS) which considers the extrinsic environmental effects that completion of the segment will have on Franconia Notch State Park. Jurisdic-

tion is pursuant to 5 U.S.C. §§ 701–706; 28 U.S.C. § 1331; and 28 U.S.C. §§ 2201 and 2202.

Plaintiffs, the Appalachian Mountain Club and four individual members (AMC) and the Society for the Protection of New Hampshire Forests and six individual members (Society), have brought separate actions against Federal and State highway officials. Save the Old Man, Inc. (SOM), is a plaintiff-intervenor in the AMC suit.[1] Plaintiffs take essentially the same position and I shall treat them as one for purposes of this suit. Defendants are: Claude S. Brinegar, former Secretary of the Department of Transportation;[2] various members of the Federal Highway Administration (FHWA); and various members of the New Hampshire Department of Public Works and Highways (NHDPWH). An organization entitled CONCERN has intervened on behalf of the defendants. CONCERN is an acronym for Council of Citizens for Economic and Environmental Responsibility. Its position is that completion of the Littleton-Waterford segment is essential to the "North Country's"[3] economic survival and that a delay in construction will cause economic and social harm to the residents of the Littleton-Waterford area.[4]

Plaintiffs allege that they will suffer grave and irreparable harm if the defendants are allowed to construct the Littleton-Waterford portion of I–93 prior to the completion of an EIS that examines the concomitant environmental effects. They contend that construction of the Littleton route will be a dangerous encroachment upon the environmental integrity and fragility of Franconia Notch and, in particular, the rock formation known as the "Old Man of the Mountains."

## THE LEGAL BACKGROUND

On August 19, 1974, I issued a preliminary injunction enjoining both Federal and State participation in the highway construction and financing of the Littleton-Waterford segment of I–93. Society for Pro. of New Hampshire Forests v. Brinegar, 381 F.Supp. 282 (D.N.H. 1974). I exempted from the injunction the construction of "a single bridge across the Connecticut River, even though such bridge may constitute a portion of the proposed construction project described in the Final Environmental Impact Statement . . . ." Id. at 290.

During the week of February 18, 1974, a hearing on the merits was held to determine whether an injunction should be issued pending completion and approval of a valid EIS. At the hearing, eighty-five exhibits were introduced into evidence. In arriving at my decision, I have considered all the exhibits offered and the "identification" is stricken from those so marked at the hearing. In addition, the forty-five exhibits introduced at the August 6, 1974, hearing on a preliminary injunction, with the exception of the Comstock affidavit, are made a part of the record.

1. Although SOM stated in its motion to intervene that it has a membership of two hundred, it did not specifically state whether these individuals would be personally harmed by the defendants' conduct. Individual members of SOM were not joined to its action. This raises the question of whether SOM has standing to intervene. Cf. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Since, however, neither SOM's evidence nor status is dispositive of this action and considering that no party has objected to its intervention, I will allow it to remain a party.

2. Subsequent to the institution of this suit, Secretary Brinegar resigned and the President appointed William R. Coleman his successor.

3. The "North Country of New Hampshire" is generally defined as that section of the State located northerly of the three notches: Franconia, Crawford, and Pinkham.

4. Plaintiffs have a personal interest in this suit because in certain situations, the courts in fashioning the appropriate equitable remedy weigh and consider economic factors. See Discussion on Remedies, infra.

## LITTLETON–WATERFORD PROJECT BACKGROUND

The preliminary planning for the Littleton-Waterford portion of I–93 began when the interstate system was first initiated in 1955. In 1956, the FHWA approved a fifty mile segment of I–93 from Plymouth, New Hampshire, to Waterford, Vermont. (Exhibit 45–195) This route encompasses the contested 6.5 mile segment from Littleton to Waterford which is at issue in this case. *See* Appendix A.

In 1958, the State received FHWA "project corridor approval" and programmed the Littleton-Waterford route as a section of I–93. (Exhibit 1, p. 11)

On November 19, 1969, a Corridor Public Hearing was held and, as a result of the hearing, the NHDPWH became committed to the construction of an interstate route from Littleton to Waterford. On November 16, 1970, the State entered into a contract with the consulting firm of McFarland-Johnson-Gibbons Engineers, Inc., which provided that McFarland was to complete all plans and specifications necessary for the proposed project. Route location approval was granted and, on June 7, 1972, the project was presented at a Design Public Hearing.

On May 5, 1974, the NHDPWH presented to the FHWA a draft EIS for the Littleton-Waterford route. On May 12, 1972, the draft was cleared by the FHWA for circulation. (Exhibit 2) The Final EIS was presented to the FHWA on May 6, 1973. On September 6, 1973, the Final EIS was approved by the Regional Office of the FHWA. On July 8, 1974, after a great deal of "in-house controversy," the Final EIS was approved by the Department of Trans-portation and filed with the Council of Environmental Quality (CEQ).[5] (Exhibit 51–175)

Before construction could begin, the project was halted by the temporary injunction issued on August 19, 1974.

## GEOGRAPHIC LOCATIONS OF THE AREAS IN QUESTION

In order to fully understand the plaintiffs' allegations, it is essential to understand the location of Franconia Notch in relation to the proposed Littleton-Waterford route and the already completed portions of I–93 in New Hampshire.

I–93 is a north-south interstate highway. It is part of the interstate highway system that links the megalopolis area of the East Coast. The New Hampshire portion of I–93 begins at the Massachusetts border and continues to North Woodstock, New Hampshire, which is less than three miles south of Franconia Notch State Park. At North Woodstock, I–93 terminates and a two-lane road proceeds through Franconia Notch for approximately eight miles. "I–93 picks up again about one mile north of the Park and continues from there to Littleton, New Hampshire, where it now terminates. The proposed Littleton-Waterford segment of I–93 will start at Littleton at the terminus of the present 93 and extend for six and one-half miles to Waterford, Vermont. It will then continue for eleven miles from Waterford to St. Johnsbury where it will connect with Interstate 91, which runs to the Canadian Border at Derby Line where it connects with Canadian Highway 55 to Sherbrooke and from thence on Canadian Highway 10 to Montreal, both of which are modern high-speed divided highways. Exhibit 44. It

5. The CEQ is comprised of three persons, selected by the President, with whom all impact statements are filed. Their functions are:
. . . to analyze and interpret environmental trends and information of all kinds; to appraise programs and activities of the Federal Government in the light of the policy set forth in subchapter I of this chapter; to be conscious of and responsive to the scientific, economic, social, esthetic, and cultural needs and interests of the Nation; and to formulate and recommend national policies to promote the improvement of the quality of the environment. 42 U.S.C. § 4344.

is evident that Franconia Notch stands squarely in the path of I–93 and from an engineering and highway construction point of view, its location invites the final link of I–93 through it. It must be noted that the stretch of I–93 running from one mile north of the Notch to Littleton was completed prior to the passage of NEPA." *Society for Pro. of New Hampshire Forests, supra,* 381 F.Supp. at 285.

If the Littleton-Waterford segment of I–93 is completed, Franconia Notch would be the only uncompleted portion of I–93 in the State of New Hampshire.

The position of New Hampshire Highway Officials and the Executive and Legislative Departments regarding the construction of I–93 through Franconia Notch has been clearly stated: They want it built. When Secretary of Transportation Volpe placed a moratorium on the construction of I–93 through Franconia Notch, their reaction was vehement. Mr. Whitaker, State Highway Commissioner, wrote to Secretary Volpe that he was "dismayed and shocked." (Exhibit 13–109) The Governor and Council adopted the following resolution:

The Governor and Executive Council of the State of New Hampshire meeting in regular session on March 4, 1970 resolved that the precipitous and unilateral action taken by the Secretary of Transportation, John A. Volpe, in "indefinitely postponing" the construction of a certain section of Interstate Route 93 involving Franconia Notch, is entirely unacceptable to them.

The Governor and Council requests that Secretary Volpe immediately rescind his action which endangers the rate of economic growth and the continued development of tourism which is New Hampshire's foremost industry. The entire area of New Hampshire north of the Mountains which are (sic) affected by this action is currently classified as economically depressed.

Further the concept of the Interstate system as a defense highway has been shattered by dead-ending Interstate 93 in the Franconia Notch area and in addition the action taken by the Secretary creates a definite safety hazard by terminating the four-lane express highway into two lanes of sub-standard primary highway. Further the investment in excess of a million dollars in planning the remaining section of Interstate 93 through Franconia Notch will be totally wasted if the decision of Secretary Volpe is not reversed. (Exhibit 6–110)

In addition, the New Hampshire Congressional Delegation met with Secretary Volpe and informed him that "both political parties presented a united front . . . that Interstate Route 93 had to be constructed through the area as now contemplated." (Exhibit 14–112)

Secretary Volpe's moratorium did not affect the uncompleted portion of I–93 north of the Notch and the Littleton-Waterford route became isolated.

The State's official position on constructing I–93 through the Notch has now become less adamant. At the hearing on the merits, State Highway Officials constantly reiterated that they were not committed to the construction of I–93 through the Notch. The NHDPWH's position is that Franconia Notch is separate and distinct from the Littleton-Waterford segment and, therefore, the question whether I–93 is to be built through the Notch should be considered independently and at a later date. It must be noted, however, that the Highway Department has never stated that it will not construct I–93 through the Notch.

## THE APPLICABLE LAW

■■ Federal law is applicable because the construction financing is pursuant to the Federal-Aid Highway Program. 23 U.S.C. § 101 et seq. Under the Federal-Aid Highway Program, the Federal Government contributes ninety percent of the construction funds and

the state contributes the remaining ten percent. As a condition to obtaining federal funds, the state must comply with all relevant federal laws and FHWA regulations. If the state was the sole financer and construction did not involve a "public parkland," 23 U.S. C. § 138, then it could construct the highway wherever and whenever it wanted. However, by accepting federal funds, the NHDPWH becomes subject to federal law.

Accordingly, this action arises under the following federal statutes: National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq.; the Department of Transportation Act of 1966, Section 4(f), 49 U.S.C. § 1653(f); and the Federal-Aid Highways Act, 23 U.S.C. § 138 (Public Parklands Act). I find that NEPA is dispositive of this action and it is, therefore, unnecessary to consider the legal ramifications of either the Department of Transportation Act of 1966 or its identical counterpart, the Federal-Aid Highways Act.

All parties agree that the provisions of NEPA are applicable to the Littleton-Waterford segment and that an Environmental Impact Statement must be prepared and approved prior to construction.

## THE ISSUE

Because this case has generated a great deal of public controversy, I find it necessary to delineate what issues I am deciding and what issues I am not deciding.

Since the latter are more numerous, I shall begin with them. I do not decide where, when, how, or why a highway is to be built. These are matters for the responsible Federal and State Highway Officials. Nor am I deciding whether completion of the Littleton-Waterford segment will: (1) generate or induce an increase in the traffic through the Notch; (2) create a coercive atmosphere which will finalize itself in the extension of I–93 through the Notch; (3) foster an economic boom in the North Coun-

try; or (4) cause extrinsic environmental repercussions in the Notch. These questions must be resolved in the EIS and not in the court.

The issue before me is narrow and clear: Whether the Final EIS for the Littleton-Waterford route complies with the provisions of NEPA.

NEPA provides in pertinent part:

The Congress authorizes and directs that, to the fullest extent possible: . . . all agencies of the Federal Government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

 (i) the environmental impact of the proposed action,

 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

 (iii) alternatives to the proposed action,

 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332.

Plaintiffs challenge the legal sufficiency of the Littleton-Waterford EIS on the following grounds: (1) that the environmental analysis in the EIS is limited to the Littleton-Waterford segment of I–93 and fails to assess the incidental environmental impact on Franconia Notch; (2) that the EIS does not present or examine alternatives to the construction of I–93 through the Notch; (3) that the draft EIS did not include raw traffic data which was required by

the FHWA's own regulations; (4) that the Final EIS contained traffic data and conclusions drawn therefrom which were not subject to the NEPA review process; and (5) that the EIS was prepared in fact by State Highway Officials and not the responsible Federal agency.

Defendants do not challenge the necessity of preparing an EIS, but contend that the Littleton-Waterford EIS conforms with NEPA's requirements. Defendants justify the parochial scope of the EIS on four grounds: (1) that completion of the Littleton-Waterford route will not foreclose or limit the assessment of alternative routes; (2) that the Littleton-Waterford route is of independent utility as an east-west corridor route; (3) that segmentation is not involved because the Littleton-Waterford project and Franconia Notch are gaps north and south of a completed thirteen mile stretch of I–93; and (4) that the Littleton-Waterford project is a single project having logical termini.

I rule that the Final EIS for the Littleton-Waterford route is legally inadequate and does not comply with the provisions of NEPA.

### THE LAW

In enacting NEPA Congress, "recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man," 42 U.S.C. § 4331(a), declared it to be the national policy that all "major Federal actions," consider the environmental ramifications of the proposed project in an EIS. The purpose of the EIS is

to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made. Moreover, by compelling a formal "detailed statement" and a description of alternatives, NEPA provides evidence that the mandated decision making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own. Calvert Cliffs' Coord. Com. v. United States A. E. Com'n, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114 (1971).

■ The thrust of the EIS is to predict and make known "to the fullest extent possible" the environmental effects of the proposed action before there has been "any irreversible and irretrievable commitments of resources . . . ." Congress did not intend NEPA to be a "paper tiger" and it is the federal court's responsibility to require that the statutory duties imposed by NEPA are not shunted aside. Calvert Cliffs, supra, 449 F.2d at 1114.

■ In determining whether the EIS procedurally complies with NEPA, the court is guided by the "rule of reason." National Helium Corp. v. Morton, 486 F.2d 995, 1002 (10th Cir. 1973); National Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (D.C.Cir. 1972). The statutory requirement that the EIS be a "detailed statement" does not place the Highway Officials in an administrative straitjacket nor does it require them to "foresee the unforeseeable." Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Com'n, 156 U.S.App.D.C. 395, 481 F.2d 1079, 1092 (1973). The court in reviewing an EIS should "look for adequacy and completeness . . . not perfection." National Helium, supra, 486 F.2d at 1004.

The underlying questions are: Does the Littleton-Waterford EIS adequately

and completely alert the responsible officials and the public of the possible environmental consequences that are extrinsic to the completion of the Littleton route? Sierra Club v. Froehlke, 486 F.2d 946 (7th Cir. 1973); Environmental Defense Fund, Inc. v. Corps of Eng. of U.S. Army, 325 F.Supp. 749, 759 (E.D.Ark.1971). And, if not, is it reasonable to expect the EIS to consider these extrinsic consequences?

## ADEQUACY OF THE EIS

### I. *Failure to Assess Extrinsic Environmental Effects*

Plaintiffs contend that the EIS is improper and unreasonably restrictive because it limits its environmental evaluation solely to the 6.5 mile segment from Littleton to Waterford. Plaintiffs claim that a "detailed statement" must include an evaluation of the incidental environmental effects that completion of the Littleton route will have on Franconia Notch. To buttress their position, they cite the Department of Transportation's own regulations for the implementation and preparation of an impact statement. Paragraph 6 of the Guidelines states:

> The highway section included in an environmental statement should be as long as practicable to permit consideration of environmental matters on a broad scope. Piecemealing proposed highway improvements in separate environmental statements should be avoided. If possible, the highway section should be of substantial length that would normally be included in a multi-year highway improvement program. PPM 90–1 § 6, 23 C.F.R. § 1.38, App. A, pp. 17–18 (1974).

Appendix E provides:

> The evaluation and discussion should specifically emphasize significant beneficial and detrimental environmental consequences upon the *State or region or community, as appropriate,* of building a new highway into or through an area, or modernizing the existing highway by upgrading and/or relocation.

This section, for instance, would discuss and evaluate *the broad impacts on the area or region* such as the problems relating to anticipated increase in urbanization or the probable impact of displacing people . . . . (Emphasis added.) 23 C.F.R. § 1.38 at p. 22 (1974).

Highway section is defined as:

> A *substantial length of highway between logical termini* (major crossroads, population centers, major traffic generators, or similar major highway control elements) as normally included in a single location study. (Emphasis added.) *Id.* at 15.

The Senate Report accompanying NEPA expressly states that one function of the impact statement is to proscribe the dangers of incremental segmentation:

> "Environmental problems are only dealt with when they reach crisis proportions. Public desires and aspirations are seldom consulted. Important decisions concerning the use and the shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades." S.Rep. No. 91–296, 91st Cong. 1st Sess. 5 (1969). Greene County Planning Board v. Federal Power Com'n, 455 F.2d 412, 424 (2d Cir. 1972).

Courts have consistently held that the "piecemealing" of highways, without assessing the reasonable consequential environmental effects, violates the spirit and letter of NEPA. The Conservation Society of Southern Vermont, Inc. v. Volpe, 508 F.2d 927 (2d Cir. 1974), aff'g 362 F.Supp. 627 (D.Vt.1973); Indian Lookout Alliance v. Volpe, 484 F.2d 11 (8th Cir. 1973), modifying 345 F.Supp. 1167 (S.D.Iowa 1972); Sierra Club v. Volpe, 351 F.Supp. 1002 (N.D.Calif. 1972); Thompson v. Fugate, 347 F. Supp. 120 (E.D.Va.1972); Named Ind. Mem. of San Antonio Con. Soc. v. Texas Hy. Dept., 446 F.2d 1013 (5th Cir. 1971)

(decided under § 4(f) of the Parklands Act.)

The dangers of incremental segmentation in the preparation of the Littleton-Waterford EIS were recognized by the Environmental Protection Agency (EPA). In a letter dated September 17, 1974, Sheldon Meyers, Director of the Office of Federal Activities wrote:

> I-93 has become a classic example of segmentation. By proposing uncontroversial segments of the highway, one per EIS, and leaving the most controversial segment for last, the FHWA is able to "build" a case, by constructing the bulk of an interstate system, for the completion of construction of the final segment of the system. In this case, that last segment will be Franconia Notch, which is a major environmental issue in New England. . . .
>
> In my opinion, to proceed with the construction of the northern segments, before a comprehensive environmental impact statement discussing all alternatives is prepared, would be contrary to the clear-expressed intent of the National Environmental Policy Act, the Council on Environmental Quality's Guidelines, and FHWA's PPM 90–1. ·(Exhibit 2–102, p. 2)

EPA's objections are significant not to prove that the EIS is inadequate, but to establish that the defendants were given adequate notice and warning that certain groups believed that the completion of the Littleton route would have an adverse impact on the Notch. The defendants chose to ignore these warnings and criticisms. The· Final EIS turned a blind eye to the possible incidental environmental effects that could occur in Franconia Notch, located only thirteen miles south of the proposed construction.

■ Plaintiffs introduced evidence, through traffic experts, that the completion of the. Littleton route would cause a fifteen to fifty percent increase in Notch traffic along with a concomitant increase in noise and air pollution. Defendants maintained that the completion of the Littleton route would have a negligible environmental impact on the Notch. This dispute underscores the cardinal deficiency in the EIS. The question whether the completion of the Littleton route would generate an increase in traffic, causing environmental harm, is to be answered by the traffic experts in the environmental impact statement and not by judges in a court of law. It is beyond this court's competence to assess the adequacy of traffic data and the conclusions drawn therefrom.[6] Congress wisely placed this responsibility with the agencies which have the proper expertise to conduct a comprehensive review and analysis. Plaintiff AMC correctly assessed the legal situation when it stated: "Plaintiffs thus need not prove that traffic will increase in Franconia Notch, or that construction will be coerced there. They need only show that these consequences were not studied." [7] I add to this that plaintiffs must also establish that it was unreasonable for the defendants not to consider the incidental environmental effects.

Defendants assert that it would be unreasonable to examine the impact upon Franconia Notch because (1) the Littleton route is of independent significance,[8] and (2) the proposed proj-

---

6. The experts disagreed as to the sophistication required in making traffic forecasts and gathering data. Professor Brand and Mr. Lee disagreed over the value that should be accorded to G in the formula that is devised to predict future traffic growth ($ADT = AG(1 + SLI)$). This court is cognizant of the adage that with statistics it's "garbage in, garbage out." It takes, however, a certain expertise to know what is the garbage, an expertise that federal courts do not have when it comes to traffic forecasting.

7. Plaintiff AMC's Brief at 16.

8. In support of its proposition, the Federal defendants cite the following cases: Sierra Club v. Stamm, 507 F.2d 788 (10th Cir. 1974); Sierra Club v.· Callaway, 499 F.2d 982 (5th Cir. 1974); Indian Lookout Alliance, supra, 484 F.2d at 19; River v. Rich-

ect is separated from the Notch by thirteen miles of completed interstate.

It is too late in the game for the defendants to assert that the Littleton-Waterford route has a separate viable entity as an east-west corridor. Throughout the EIS, the Littleton route was referred to as part of the north-south interstate system. (Exhibit 1 at pp. 11 and 14) The purpose of the Littleton-Waterford route, at least as outlined in the EIS, was to complete the interstate system in New Hampshire.

Since the whole is the sum and total of all its parts, to deny a part of an interstate system is to deny the system itself. It is believed that both the benefits of interstate highways, and the need for such a system in New Hampshire, as well as New England, have long been satisfactorily established. (Exhibit 1, p. 44)

Although defendants assert that there is a need for an interstate highway running in an east-west direction, no one has suggested that an interstate is being contemplated to run from Portland, Maine (the starting point for distribution of goods and materials in the North Country, *Testimony of Mr. Copenhaver*),

through Littleton, New Hampshire, and on to St. Johnsbury, Vermont.

I must point out that the decision that the Littleton-Waterford route is important as an independent road, rather than as a part of I-93, is not only a late decision, but one that can be suspiciously viewed as an attempt to avoid the necessity of preparing a complete EIS.

■ Assuming arguendo that the Littleton-Waterford segment is found to be of independent utility, the EIS would still be inadequate. The EIS did not contain any information that referred to the Littleton route as being part of an east-west corridor. It was only through supplemental information, which was not included in the EIS, that the Littleton to Waterford route was transformed into an east-west route. This change in attitude and purpose never received the distribution and circulation that NEPA requires. No one was able to offer alternatives or question the necessity of building an interstate highway in order to satisfy east-west traffic needs. Supplemental information, which has not been subject to the NEPA review process, cannot revamp the Littleton route into an east-west route. I-291

mond Metropolitan Authority, 359 F.Supp. 611 (E.D.Va.), aff'd 481 F.2d 1280 (4th Cir. 1973); Movement Against Destruction v. Volpe, 361 F.Supp. 1360, 1379–1385 (D.Md. 1973), aff'd 500 F.2d 29 (4th Cir. 1974).

All of defendants' cases are either distinguishable or support plaintiffs' position. In *Lookout Alliance, supra,* 484 F.2d at 19, the Eighth Circuit, while recognizing that an EIS should not place a state into an administrative straitjacket, held that the EIS should go beyond the limited area of construction.

The issue in MAD v. Volpe, *supra,* and *James River, supra,* was whether the proposed construction was a "major Federal action" requiring the preparation of an EIS. Sierra Club v. Callaway, *supra,* involved the construction of a dam at the mouth of the Trinity River (Wallisville Project) and the construction of a navigable riverway between Houston and Fort Worth, Texas (Trinity River Project). Plaintiffs argued that both projects should be enjoined pending the sub-

mission of an EIS that studied the impact that the Wallisville Project construction would have on the Trinity River Project. The Fifth Circuit reversed the District Court's granting of an injunction. *Callaway* is distinguishable on the following grounds: (1) separate Congressional approval was given for each of the projects; (2) when plaintiffs brought suit, seventy-seven percent of the Wallisville Project was completed; (3) the projects were advancing two distinct purposes; and (4) the Wallisville Project was miniscule in both monetary expenditure and scope compared to the Trinity Project. *Id.* at 987–990.

Sierra Club v. Stamm, *supra,* 507 F.2d at 791, was another dam sewerage case. The Tenth Circuit affirmed the trial court's finding that "the Strawberry Aqueduct and Collection System has an independent utility of its own as a collection and conveyance system of water" as being adequately supported by the record.

Why? Association v. Burns, 372 F.Supp. 223 (D.Conn.1974).

Plaintiffs do not contend that the EIS should cover the entire I–93 route both north and south of the proposed project. Instead, the focus of their attention is on the Notch area. It is artificial to contend that Littleton and Waterford are natural route termini when Franconia Notch with its environmental fragility lies just thirteen miles south of the project.

 The fact that the thirteen miles between Littleton and Franconia is interstate highway is not reason to truncate the scope of the EIS. The interstate from Franconia Village to Littleton was completed prior to the implementation of NEPA. The broad scope analysis proscribed by NEPA is designed so that we may "avoid the recognized mistakes of previous decades." *Greene County, supra,* 455 F.2d at 424.

The EIS, when reason allows, should be "more extensive than the proposed project." *Indian Lookout, supra,* 484 F. 2d at 19. To determine how far down the road the EIS should look, the court applies the rule of reason. *Committee to Stop Route 7 v. Volpe,* 346 F.Supp. 731, 740 (D.Conn.1972).

 The concepts of "independent utility" or "logical termini" are not talismans that truncate the natural scope of an EIS. Reason mandates that the defendants assess the environmental harm, if any, that will occur to Franconia Notch if the Littleton-Waterford segment is completed.

Franconia Notch is a State Park of great natural beauty. The Flume and Basin alone make it unique. But it is the granite ledges high on the flank of Cannon Mountain forming the profile known as the "Old Man of the Mountain" that makes Franconia Notch the site of one of the natural wonders of the world. The profile rocks are now stabilized by pins and cables. * * * The Notch has been the scene of rock slides of sizeable proportions in the immediate past. The scars of such slides are still visible. * * * It would be a crime to take even a slight risk of depriving future generations of the view of this legendary granite face so as to satisfy our present demand for speedy uninterrupted automobile travel. *Society for Pro. of New Hampshire Forests, supra,* 381 F.Supp. at 288.

I find that it is unreasonable for the EIS to ignore the possible environmental effects that could occur in Franconia Notch due to the completion of the Littleton-Waterford segment. As prepared, the EIS violates both the spirit and the letter of NEPA.

II. *Adequacy of Alternate Routes Study*

Plaintiffs argue that, prior to the approval of the Littleton-Waterford EIS, defendants must assess the alternatives, if any, of routing interstate and international traffic away from the Notch. As an adjunct to this argument, plaintiffs allege that the completion of the Littleton route will render present alternatives less attractive and thereby coerce the construction of an interstate facility through the Notch.

NEPA specifically requires that "alternatives to the proposed action" be considered in the EIS. 42 U.S.C. § 4332. This prerequisite has been described as "the linchpin of the entire impact statement." *Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693, 697–698 (2d Cir. 1972). Plaintiffs contend that there are three alternate routes which should have been examined in the EIS prior to its approval.[9] By

9. The following alternatives were offered by the plaintiffs: (1) diverting traffic from Plymouth, New Hampshire, in a northwesterly direction along Route 25 and linking up with I–91 in Vermont; (2) diverting traffic from Lincoln, New Hampshire, along Route

linking the New Hampshire and Vermont Interstates south of the Notch, these alternate routes provide an opportunity to avoid the funneling of interstate and international traffic through the Notch.

The impact statement's discussion of alternatives is limited to the 6.5 mile segment from Littleton to Waterford. Its examination of alternative routes totals two pages (Exhibit 1, pp. 33–34). *Cf.* Sierra Club v. Stamm, 507 F.2d 788, 793 (10th Cir. 1974), where the court in assessing whether there was a good faith compliance with NEPA noted that over one hundred pages in the EIS were devoted to consideration of alternatives. While quantity does not connotate quality, an assessment of alternatives that is limited to two pages raises a red flag that there has not been an examination to the "fullest extent possible."

The State Highway Department, which prepared the impact statement (*see* Federal-State Responsibility in The Preparation of An EIS, *infra*), felt that an assessment of alternatives was unnecessary.

. . . Mr. Whitaker said that in his opinion there were no reasonable alternatives to the Department's initial concept of carrying Interstate I–93 through the Notch. It was also the Department's opinion, from an environmental standpoint, that considerably more damage would result from the alternatives proposed by other groups. (Exhibit 48–106, p. 1)

This may be, but when EPA and various environmental organizations raised the objection that the project "may have a major adverse impact on the environment because it essentially contributes to the elimination of alternatives which avoid Franconia Notch," the EIS responded only by stating that this argument was "specious." (Exhibit 1, p. 43) The impact statement's response, and treatment of the problem raised by the plaintiffs, is clearly inadequate.

The proper response to comments which are both relevant and reasonable is to either conduct the research necessary to provide satisfactory answers, or to refer to those places in the impact statement which provide them. Lathan v. Volpe, 350 F.Supp. 262, 265 (W.D.Wash.1972).

The EIS did neither. To meet the good faith test, Environmental Defense Fund v. Corps of Eng., U.S. Army, 470 F.2d 289, 296 (8th Cir. 1972), the agency must establish that it has carefully weighed the environmental factors in its decision to proceed with the project. The defendants have not met their burden.

In addition, in order to assess the environmental factors "to the fullest extent possible" the CEQ requires that review begin "at the earliest possible point." Conservation Society of Southern Vermont, *supra,* 508 F.2d at 935 citing 38 Fed. Reg. 10856, 10865 (1973). The impact statements "are to serve as the means for assessing the environmental impact of proposed agency actions, rather than as a justification for decisions already made." *Id.,* citing 38 Fed.Reg. 20550, 20552 (1973).

The EIS must, therefore, contain a detailed discussion of all reasonable alternatives to a proposed project prior to the "irreversible and irretrievable commitments of resources" so that the responsible decision-makers are aware of the environmental "tradeoffs" that may occur when one course of action is chosen over another. Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346, 350 (8th Cir. 1972). The reduction of route alternate analysis to an isolated locality curtails "subsequent broad-scale assessment of alternatives."

112, in a northwesterly direction and linking up with I–91 in Vermont; and (3) the diversion of traffic south of Concord along Interstate 89 which would link up with I–91 in Vermont. *See* Appendix A.

*Conservation Society of Southern Vermont, supra,* 508 F.2d at 935.

If an impact statement is prepared with respect to a small length of a proposed highway, NEPA's requirements of adequate consideration of alternatives cannot be complied with.

* * * With respect to a proposed highway, consideration of alternatives has two dimensions: an initial choice between building the highway or relying on existing routes or alternative means of transportation, and a subsequent choice among various alternative routes and designs. Consideration of the environmental impact of a small segment of a proposed route makes impossible adequate consideration of either set of choices. Alternatives to building an expressway are not brought into focus when consideration is given to just one segment. Moreover, placement of one segment tends to narrow the range of choices for placement of the remainder of the entire highway, thereby precluding adequate consideration of alternative routes. Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731, 740 (D.Conn. 1972).

Defendants argue that the approval of the Littleton-Waterford route does not foreclose the examination of alternative routes that avoid Franconia Notch. They attempt to substantiate their position by pointing out that (1) FHWA approval of the Littleton route was on the "understanding . . . that full consideration will be given to alternative alignments to the Franconia Notch route of I-93" (Exhibit 51-176) and (2) that the State has presently contracted with a consulting firm (VTN) to consider and examine the possible alternative routes. The essential question is: When must the examination of alternative routes occur?

Plaintiffs argue that the study should take place prior to the construction of the Littleton-Waterford segment; defendants contend that the study can be conducted subsequent to the construction of the Littleton route.

NEPA mandates that the study of alternative routes be considered at the "earliest possible point." While I do not question the good faith of defendants' assurances, the time for examining alternative routes should be when it is practical to implement them, and not after the expenditure of millions of dollars when it may be too late. *Conservation Society of Southern Vermont, supra;* SIPI v. AEC, *supra.* It is quite possible that a later analysis of alternatives will prove to be a "hollow exercise." *Calvert Cliffs, supra,* 449 F.2d at 1128. This was the fear of Wallace E. Stickney, Director of the Environmental Impact Office in Boston, when he wrote:

. . . now is the time to analyze alternate methods of routing interstate and local traffic through and around the Notch. If alternatives are eliminated by the construction of the northern segments of I-93 without considering the Notch, an impact statement prepared on the Notch alone cannot practically consider any alternate traffic routing because the course will have been predetermined by prior decisions. The level of service of any type of road through the Notch will be determined by the level of service of the road on either end of the Notch. (Exhibit 8, p. 3)

There can be no doubt that the completion of the Littleton route will require a substantial commitment of both Federal and State monies and resources. It is, therefore, incumbent upon the defendants to conduct a broad scope review of alternative courses of action prior to constructing the Littleton-Waterford route.

III. *Federal-State Responsibility in The Preparation of An EIS*

NEPA requires that the EIS be prepared by "the responsible Federal official." Plaintiffs argue that the

NHDPWH prepared the EIS with little federal participation and that the EIS is therefore inadequate.

Courts are split on the issue whether the Final EIS must be exclusively prepared by the FHWA. In Conservation Society of Southern Vermont, *supra*, the Second Circuit held that the FHWA had a non-delegable duty to exclusively prepare the EIS.

> . . . [W]e conclude that FHWA is in the best position to weigh the costs to the environment and the benefits hoped for from the project and then to reach, as it must, a decision based on "its own evaluation of the environmental issues."

> A state agency is established to pursue defined state goals. In attempting to secure federal approval of a project, "self-serving assumptions" may ineluctably color a state agency's presentation of the· environmental data or influence its final recommendation. Transposing the federal duty to prepare the EIS to a state agency is thus unlikely to result in as dispassionate an appraisal of environmental considerations as the federal agency itself could produce. *Id.* 508 F.2d at 931.

Other courts have held that NEPA is satisfied even though the EIS has been prepared by the recipient of the proposed federal aid. Sierra Club v. Lynn, 502 F.2d 43, 59 (5th Cir. 1974); Iowa Citizens for Environmental Quality v. Volpe, 487 F.2d 849, 854 (8th Cir. 1973); Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir.), cert. denied 414 U.S. 1052, 94 S.Ct. 558, 38 L.Ed.2d 341 (1973); and Citizens Environmental Council v. Volpe, 484 F.2d 870 (10th Cir.), cert. denied 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974).

■ CEQ states its position as follows:

> CEQ has traditionally not objected to delegation of the preparation of a statement in those instances where the Federal agency has maintained responsibility for the objectivity and adequacy of the statement. Efficient use of resources suggests that the party closest to the development of a project should engage in at least its preliminary environmental analysis. Where this party is a state or local government, the responsibility of the Federal agency is to ensure that environmental considerations are meaningfully integrated into the project's design. This requires at least some review of the project and the impact statement by the agency. But it does not require an agency in every case to engage in an independent preparation of the impact statement. The Fifth Annual Report of the Council on Environmental Quality at pp. 397-398 (1974).

The administrative interpretation of the Act by the enforcing agency is entitled to great deference. Griggs v. Duke Power Co., 401 U.S. 424, 434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

■ But while courts may differ on the extent to which a federal agency must engage in independent environmental analysis, there is no question that the federal agency must play an active role in the preparation of the EIS. The FHWA cannot rubber stamp a state prepared impact statement and satisfy the requirements of NEPA.

It is undisputed that the major portion of the EIS, if not the entire statement, was prepared by the State Highway Department. Mr. Gergler, FHWA Area Engineer for New Hampshire, testified that he did not discuss with State officials the scope of the Littleton-Waterford EIS with regard to either corridor alternatives or possible extrinsic environmental effects. In an attempt to establish Federal participation in the preparation of the EIS, the Federal defendants introduced ten exhibits which were allegedly representative of the Federal input into the Littleton-Waterford EIS. An examination of the exhibits is a futile exercise if one is looking for a

discussion of the Littleton-Waterford EIS; the exhibits are devoid of any mention of either the scope or the extent to which the Littleton EIS should address itself. (Exhibits 57–201–66–221, inclusive)

Even under the lesser standard as enunciated in Sierra Club v. Lynn, *supra*, and *Life of the Land, supra*, the FHWA must give more than a cursory review of the state prepared impact statement; it may not "substitute the applicant's efforts and analysis for its own." Sierra Club v. Lynn, *supra*, 502 F.2d at 59.

There has been no evidence that the FHWA has engaged in any independent analysis or evaluation of the Littleton project's environmental impact. There has been no indication that the FHWA "conceived, wrote or even edited any section of or passage in the EIS. At the most there were informal chats touching upon the subject . . . ." *Conservation Society of Southern Vermont, supra*, 362 F.Supp. at 632.

Based on all the evidence, I find that Federal participation in the preparation of the EIS was so perfunctory as to amount to a rubber stamp. Once the FHWA was informed that there was a possibility that construction of the Littleton to Waterford route would cause discernible environmental effects, it was its duty to "make its own evaluation of the environmental issues. . . . ." 40 C.F.R. § 1500.7(c). The FHWA abdicated its responsibility to the State, in violation of NEPA, when it failed to undergo an independent environmental analysis of the possible environmental effects to Franconia Notch.

IV. *Supplemental Information Appearing in A Final EIS*

Plaintiffs' final contention is that the Final EIS is inadequate because it contained traffic data which was not included and circulated in the draft statement.

A failure to include traffic data in a draft impact statement is a vi-

olation of FHWA's regulations. PPM 90–1, 23 C.F.R. § 1.38, p. 19 (1974). The question is whether the inclusion of the data in the final EIS can rectify the omission.

NEPA is at the "very least a disclosure law." Environmental Defense Fund v. Corps of Eng. of U.S. Army, 325 F.Supp. 749, 759 (E.D.Ark.1971). In order to effectuate the disclosure aspects of NEPA, the CEQ established that an EIS must undergo two stages of review.

In the first stage, a draft impact statement is prepared and circulated to the public and various agencies for comments and criticisms. This is the vital stage, for it is here that outside review can vitiate "objective errors or excessive bias in an EIS." *I–291 Why? Association, supra*, 372 F.Supp. at 258. This is the only time when the public and outside agencies are able to closely analyze the impact statement and their comments, provided that they are responsible, must be included in the final EIS. Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783, 787, cert. denied 404 U.S. 917, 92 S.Ct. 242, 30 L.Ed.2d 191 (1971).

In the second stage, the final EIS receives only "in-house" review. This stage guarantees "that those ultimately responsible for agency decisions have a factual basis for their review of their subordinates' recommendations." *I–291 Why? Association, supra*, 372 F.Supp. at 258.

By requiring opposing viewpoints to be included in the final EIS, Congress intended for those beyond the decisional agency to be cognizant of all "environmental tradeoffs" that may occur if the project was approved. A balanced EIS is a vehicle for responsible decision-making.

There cannot be responsible decision-making when data appears in the final EIS without being subject to the critical evaluation that occurs in the draft stage.

There are two dangers that can occur when information appears in the final EIS for the first time: (1) the ultimate decision-makers will believe that there is no controversy due to the lack of critical comment; and (2) objective errors without being red-flagged would go unnoticed. It is for these reasons that PPM 90-1 provides: "A supplemental statement is to be processed in the same manner as a new environmental statement." 23 C.F.R. § 1.38, p. 20 (1974).

 Supplemental information, which has not been processed in the same manner as a draft EIS, cannot resurrect a deficient impact statement. I-291 Why? Association, supra, 372 F. Supp. at 253-260. The failure to include traffic data in the draft impact statement denied the plaintiffs the "opportunity to test, assess, and evaluate the data and make an informed judgment as to the validity of the conclusions to be drawn therefrom." [10] In addition, the absence of critical comment created the erroneous impression that there was no disagreement as to either the statistics or the conclusions.[11] I find that the draft EIS did not comply with PPM 90-1 and that the supplemental information contained in Appendix C of the Final EIS was not processed in accordance with the procedures required by NEPA.

### SUMMARY

I find that the Final EIS for the Littleton-Waterford segment of I-93 violated NEPA for the following reasons:

1. It failed to assess the extrinsic environmental effects that construction would have on Franconia Notch;

2. It failed to examine alternative routes that would avoid construction of an interstate facility through Franconia Notch;

3. It included supplemental traffic data which was not part of the draft statement and, therefore, not subject to NEPA's review process; and

4. It was not prepared by the responsible Federal agency.

I find that plaintiffs will suffer grave and irreparable harm if the Littleton-Waterford segment of I-93 were to be constructed in the absence of an EIS which considers the extrinsic environmental impact that construction will have on Franconia Notch and the "Old Man of the Mountain."

### RELIEF REQUESTED

Plaintiffs seek to have the injunction issued August 17, 1974, remain in effect pending the completion and approval of a valid EIS. Defendants argue that this court, in considering the equitable relief to be afforded, should consider the economic impact that will result from the issuance of an injunction and, thereby, deny the requested relief.

In determining the remedy, some courts have held that if NEPA has been violated, then "a court should not inquire into the traditional requirements for equitable relief." Atchison, Topeka and Santa Fe Railway Co. v. Callaway, 382 F.Supp. 610, 623 (D.D.C.1974). Other courts disagree and consider equities in fashioning a remedy, despite the fact that NEPA has been violated. Sierra Club v. Callaway, 499 F.2d 982, 988 (5th Cir. 1974) and cases cited therein.

---

10. Plaintiff Society's Request at p. 3.

11. The data in question, which is contained in Appendix C of the Final EIS, indicated that there would be approximately a fifty-nine percent increase in traffic under either the build or no-build alternative. The State employee who prepared this data is now working in Arizona and he did not testify. His working papers were not introduced at trial and, according to Professor Brand, were unavailable. Society's counsel strongly intimated that there were statistical objections to the manner in which the data was interpreted and gathered.

■ I do not believe it necessary to fashion an iron-clad rule that, whenever there has been any kind of a violation of NEPA, an injunction must be issued. Instead, the court should assess each situation on a case by case basis to determine the appropriate scope of relief. The burden, however, should be on the defendants to establish that the equities are "clearly and strongly" in their favor if an injunction is to be denied. *Conservation Society of Southern Vermont, supra,* 508 F.2d at 936.

■ I find that the defendants have not met their burden and that an injunction should be issued pending completion of a valid EIS for the following reasons:

1. The Littleton-Waterford route is not to be constructed until 1977 or 1978;

2. Construction of the Waterford to St. Johnsbury segment, if built, will not begin until 1980;

3. The Littleton-Waterford route has been programmed since 1958 and it was not until 1968 that the State and Federal governments began to take affirmative action;

4. The State has already contracted with a consulting firm (VTN) to assess the possible alternative routes to the construction of I–93 through the Notch;

5. Construction has not yet begun on the project;

6. While an interstate highway may be an economic stimulus to a geographical location, that cannot override a strong national policy; and

7. The economic impact to the State will be negligible if an EIS is promptly and adequately prepared.

## ATTORNEYS FEES

■ Plaintiffs seek to be awarded their attorneys' fees. 28 U.S.C. § 2412 provides in pertinent part that:

The United States shall be liable for fees and costs only when such liability is expressly provided for by Act of Congress.

Attorneys' fees cannot be assessed against the FHWA because NEPA does not provide for the recovery of attorneys' fees. Wilderness Society v. Morton, 162 U.S.App.D.C. 446, 495 F.2d 1026, 1036 (1974), cert. granted 419 U.S. 823, 95 S.Ct. 39, 42 L.Ed.2d 47 (1974). The State, however, stands in a different position.

. . . [C]ourts have often awarded fees against state agencies or officials . . . [w]hen private litigation vindicates a significant public policy and, at the same time, creates a widespread benefit . . . ." Natural Res. Def. Coun., Inc. v. Environmental Pro. Agcy., 484 F.2d 1331, 1333 (1st Cir. 1973).

■ I believe it would be improper, in the instant case, to assess costs against the State. The ultimate responsibility for the preparation and adequacy of an EIS is on the FHWA. 40 C.F.R. § 1500.7(c). The EIS is inadequate not because of anything that the State did, but as a consequence of what the FHWA failed to do. The NHDPWH is not a private firm which seeks to profit from the construction of roads. *See* Wilderness Society v. Morton, *supra.* The benefits which it receives are benefits that accrue to the citizens of the State of New Hampshire. The New Hampshire Highway Department Officials honestly and sincerely believe that the construction of the Littleton-Waterford segment of I–93 will be of benefit to the citizens of New Hampshire.

Plaintiffs' prayer for costs is thereby denied.

It is hereby ordered that the injunction issued on August 19, 1974, be and is continued in effect pending the completion and approval of a valid EIS for the Littleton-Waterford route.

So ordered.

See Appendix on following page

## APPENDIX A